## MANASCO v. STATE.

### Opinion delivered June 17, 1912.

1. HOMICIDE—INSTRUCTIONS—GENERAL OBJECTION.—Where, in a prosecution for murder, the court correctly instructed the jury as to the law of self-defense, an instruction "that no language *or conduct,* however violent, abusive, or insulting, will justify or excuse the taking of a human life" was not open to a general objection, and will be construed to refer only to the language of the deceased, and not to his acts. (Page 406.)

2. APPEAL AND ERROR—ABSTRACT INSTRUCTION—HARMLESS ERROR.—One appealing from a conviction of murder in the second degree can not complain of the giving of an abstract instruction with reference to threats made by the deceased, where there was no proof thereof, as such instruction could not have prejudiced appellant. (Page 407.)

3. HOMICIDE—PROVOKING COMBAT—QUESTION FOR JURY.—Where there was evidence that defendant employed abusive language towards and in the hearing of the deceased and made threats against him, it was a question for the jury whether defendant provoked and voluntarily entered into the combat. (Page 407.)

4. SAME—PROVOKING COMBAT—SELF-DEFENSE.—Where defendant had entertained a grudge against deceased, and had used language in his hearing to provoke him to anger and cause him to bring on a combat whereby defendant might have the opportunity of killing him or doing him great bodily harm, defendant would not be excused or justified

in the killing unless he withdrew from the combat as far as he could and did all in his power consistent with his safety to avoid the danger and avert the necessity of the killing. (Page 408.)

5. SAME—INSTRUCTION—SELF-DEFENSE.—An instruction that, though the jury may believe deceased was making a hostile demonstration against defendant at the time of the killing, still if they further believe that defendant could reasonably have avoided any danger and averted the necessity for the killing, it was his duty to do so, is not open to the objection that it substitutes the judgment of the jurors for that of the defendant. where another instruction given properly stated the law on that subject. (Page 408.)

6. SAME—INSTRUCTION—HARMLESS ERROR.—Where there was nothing to indicate that deceased intended a deadly assault on defendant or to do him great bodily injury, an erroneous instruction as to the right of a party assaulted to stand his ground, though inapplicable, was not prejudicial. (Page 408.)

7. APPEAL AND ERROR—PRESENTING QUESTION BELOW.—Defendant can not complain because the trial court amended an instruction after his counsel had closed his argument to the jury if he made no request for permission to argue the instruction. (Page 409.)

Appeal from Howard Circuit Court; *Jefferson T. Cowling,* Judge; affirmed.

STATEMENT BY THE COURT.

On the 8th day of January, 1912, in Howard County, Arkansas, Walter Manasco killed T. D. Patterson by stabbing him with a knife. Patterson was a merchant at Umpire, In addition to his regular store, he had a warehouse a short distance away, but not connected with the store. The appellant, with one Park Hunter, was standing down on the warehouse gallery; Patterson went down there, and asked the boys what they were doing. According to the testimony of appellant, Patterson said: "Let me lock the door," and he locked the door and started back when appellant said: "Don't I owe you ninety cents?" Patterson replied: "Yes." Appellant then handed him a dollar bill, and he handed appellant ten cents. Appellant then said: "By G——, we are even, a'nt we?" Patterson said: "Yes." Appellant said: "We will stay that way." Patterson said: "All right," and turned and went back in his store, and appellant and Park Hunter also went back in the store. Appellant and Park Hunter remained there a little while, until Mr. Stone, the blacksmith, called appellant to assist in shoeing appellant's mare. Then he and Park Hunter

went over with Mr. Stone, the blacksmith, and, according to the testimony of Mr. Stone, while they were going to the shop the following took place: "'One of them, I don't know which one, said: 'We got run out awhile ago,' and I spoke about something else, and when I got through they mentioned it again, and I says: 'Out of where?' and he says, 'Out of that old devil's store.' · He says: 'We went down there in his warehouse, and Mr. Patterson came down there, and says: 'What are you doing here?' and Park says: 'I told him that we wasn't doing a G—d—thing:' Walter says: 'I told him we wasn't trying to steal anything. The damned old s— o— a b—.', he says, 'if he fools with me, he will get his entrails cut out.' "

The appellant and Park Hunter, in their testimony, denied that such conversation took place between them and witness Stone.

After the mare was shod, the two boys, Walter Manasco and Park Hunter, left witness Stone's shop together, and went into Patterson's store together. The witness describes what took place in the store when the boys first went in before the fatal encounter as follows: "It was afternoon when they came in. They came in the store, and seemed to be tickled about something, and monkeyed around there, and were whittling, and kept looking kind o' like they were tickled, and I just watched them, and they brought out an oath or two; I don't know which one, but there was an oath, and in very a short time they went out of the house, and walked down towards Mr. Patterson's hardware store. After they passed, going towards Patterson's hardware store, Mr Patterson went towards the door on his tiptoes, walking light, and I allowed maybe he thought the boys were in the lower house. Any way he went over in there, and I heard the door shut. After the door shut, Mr. Patterson came back in the house, and took his seat, and looked like he was kind o' mad, but didn't say anything. After he had · taken his seat and lit his pipe, Walter and Park came back in there, and Walter came in between me and Henry Townsend, and pulled his knife out of his pocket. He just sort of got over there on the counter, and pulled his knife out, and looked over at Patterson, and I turned my eye at Walter, and I saw there was something wrong with them. The way he looked over there

at Mr. Patterson, I just drew an idea something had went wrong with him by him drawing that knife out and looking at him. He just went on and got on the other side of the stove, and picked up some shavings, and went to whittling on them, and got a little further around there, when Mr. Stone called him, and he then went out of the house. Neither Walter nor Park said anything to Patterson while they were in the store at that time."

A witness, Arthur Hunter, a half-brother of Park Hunter, who was in the store when appellant and Park Hunter returned to the store from the blacksmith shop, testified as follows: "They were gone maybe half an hour, and they both came back into the store, back around the stove. Patterson was sitting by the stove at that time. I asked Mr. Patterson if he had any calico, and he got up and went behind the counter to get the calico, and walked up to about middleways of the house, and laid the cloth on the counter. He was measuring the cloth off for me when I heard Walter cursing back about the stove. Patterson said to him: 'If you are mad at me and want to jump on me or whip me, get at it.' Walter said, 'All right,' and said either 'By G—,' or 'G— d—— you, I had just as soon whip you as anybody!' And when he said that he started immediately, and Bill Manasco got hold of his coat. Bill was sort o' behind Walter when he grabbed him by the coat, just as he started to go behind the counter. He stopped at the openings between the counters. Patterson was coming on down behind the counter, and took off his coat as he walked down there; he laid his coat on the counter. When he got up to where Walter was, he throwed up his hands, and I saw Walter strike him with a knife. Patterson threw up his hands before Walter struck, when the knife struck in Patterson's breast. I looked back down to where he was, and he says: 'He has killed me.' I started to him, and when I got right to him, Walter and Bill come up on the other side of the house, and Patterson picked up an axe handle as they passed on out by him, and drew the same to strike, and Bill says, "Tip, don't hit me.' When Patterson threw up his hands, he had nothing in them. When the trouble came up, Walter went west. When he started, he didn't go in the direction of Patterson, but he went west, and Patterson went on down west between the wall

and the counter. Walter had to go three or four steps to get to the end of the counter, and Patterson had to go fifteen or twenty feet. Bill took hold of Walter just as soon as he started, and stopped him at the end of the counter."

A witness on behalf of the State testified that he saw Walter come down Patterson's steps after he heard of the cutting. Walter "was walking tolerably pert," says the witness, "and as he come down the steps I heard him say, 'He needs his throat cut,' or 'ought to have his G— d—— throat cut."

Appellant testified, in part, as follows as to the fatal encounter: "Arthur asked Patterson if he had any red calico, and he said, 'Yes,' and they got up to go get it, and I was telling Bill that Patterson came down there and ordered us out of his old storehouse and off his old gallery, and asked us what we were doing there, and as I told Bill Mr. Patterson heard me, and says: 'Walter, if you are mad at me and want to fight me, just get ready.' And, as he said that, I turned and looked at him this way, and says, 'By G——, I had just as soon fight you as anybody.' I supposed he was bluffing at me, and I meant to bluff him. I did not think he was going to fight me. When I said this, he threw his hat off, laid it down on the counter, and came towards me betwixt a trot and a run. He was coming west towards me, and the counter ran down a piece from the stove, about six feet, and I got down off the counter, and went down towards the end of the counter, and, just as I got to the end of the counter, I saw he was still coming, and I run my hand in my pocket, and opened my knife, and stepped right to the end of the counter and he ran into me, and was striking at me with his right fist, and I just threw this hand and hit him with the knife. I struck him twice. I didn't intend to kill him; didn't intend to have any fight with him; struck him to keep him from running on to me. I do not know where I struck him."

Park Hunter and Bill Manasco corroborated, substantially, the testimony of Walter Manasco, and their testimony tends to show that when Patterson started towards Walter Manasco, Bill Manasco told Patterson that Walter didn't want to fight him, and there was no use of having any trouble, but that didn't stop Patterson; that Bill Manasco endeavored to get

Walter back out of the way. The testimony showed that Walter Manasco, at the time of the killing, was seventeen years of age and weighed 129 pounds; Patterson was over fifty years of age, and weighed about 200 pounds. The testimony showed that Walter Manasco had taken two drinks that day, but he was not drunk.

The above are substantially the material facts upon which the appellant was indicted for the crime of murder in the first degree. He was convicted of murder in the second degree, and sentenced to the penitentiary for eleven years.

The court, at the request of the State, among others, gave the following instructions, of which appellant complains, towit:

"13. You are instructed that no language or conduct, however violent, abusive or insulting, will justify or excuse the taking of a human life, nor will it reduce the grade of homicide from murder to manslaughter.

"14. You are instructed that if you find and believe from the evidence in this case, beyond a reasonable doubt, that the defendant cut and stabbed the deceased on account of any real or imaginary grievance which he might have had against the deceased, or on account of any threats the deceased might have made against him, or on account of any insulting language which the deceased might have used towards the defendant, or if you should believe beyond a reasonable doubt that he was actuated by all of these in cutting and stabbing the deceased, then you will convict the defendant of murder in the first degree, according as you may find and believe that he acted with or without deliberation and premeditation when he cut and stabbed the deceased.

"15. If you believe from the evidence in the case, beyond a reasonable doubt, that the defendant provoked or voluntarily entered into, or that he sought out the deceased for the purpose of renewing, the difficulty, and, when he did so, of killing his assailant, he can not shield himself on the plea that he was defending himself. He can not take advantage of a necessity produced by his own unlawful or wrongful acts after having provoked or excited or sought the attack, if you find from the evidence, beyond a reasonable doubt, that he did so, he can not be excused or justified in killing his assailant for the pur-

pose of saving his own life or preventing great bodily injury, unless he had in good faith withdrawn from the combat as far as he could, and did all in his power to avoid the danger and avert the necessity of the killing.

"16.   You are told that the law has such regard for the sanctity of human life that one person may not kill another, even in his necessary self-defense, except as a last resort, and when he has done all within his power, consistent with his safety, to avoid the danger and avert the necessity of the killing; so in this case, although you may believe that the deceased was making a hostile demonstration against the defendant at the time of the killing, still, if you further believe from the evidence that the defendant could have reasonably avoided any danger to himself, and averted the necessity for killing the deceased, it was his duty to have done so."

The court gave at the request of appellant his prayer for instruction No. 12, as follows:

"12.   You are instructed that, if you believe from the evidence in this case that the defendant was assaulted by the deceased with such violence as to make it appear to the defendant at the time, acting without fault or carelessness on his part in reaching such conclusion, that the deceased manifestly endeavored and intended to take his life, or do him some great bodily harm, and that the danger was so imminent and impending or appeared so to the defendant, then in that case the defendant was not bound to retreat, but had a right, under the law, to stand his ground and to repel force with force, and, if need be, kill his adversary to save his own life or prevent his receiving great bodily injury; and it is not necessary that it shall appear to the jury to have been necessary."

After counsel for defendant had closed his argument and the court had taken a recess for noon, and had reassembled, the court amended instruction No. 12, so as to make it read as follows:

"12.   You are instructed that if you believe from the evidence in this case that the defendant was assaulted by the deceased with such violence as to make it appear to the defendant at the time, acting without fault or carelessness on his part in reaching such conclusion, that the deceased manifestly endeavored and intended to take his life, or to do him some

great bodily harm, and that the danger was so imminent and impending or appeared so to the defendant, as to make it more dangerous to retreat than to stand his ground, then in that case the defendant was not.bound to retreat, but had a right, under the law, to stand his ground, and repel force with force, and, if need be, kill his adversary to save his own life or prevent his receiving great bodily injury; and it is not necessary that it shall appear to the jury to have been necessary."

To the refusal of the court to give the said instruction as originally asked, and in amending the same, and especially in amending it after counsel had closed his argument, defendant at the time saved his exceptions.

The appellant requested, among others, the following prayers for instructions, towit:

"3. Although the jury may believe from the evidence that immediately preceding the assault made upon the defendant by Patterson, if you believe there was such an assault, the defendant used insulting or abusive language towards or about Patterson, yet this language would not justify Patterson in making an assault upon the defendant; and if you believe that such an assault, if one was made, was calculated to and did arouse the defendant to great passion, either of anger, fear or terror, and, while laboring under such passion, he inflicted the injury from which Patterson died, he can not be convicted of anything greater than manslaughter." And,

"7. You are instructed that the indictment in this case is of itself a mere accusation or charge against the defendant; that it raises no presumption of his guilt, and is not of itself any evidence of his guilt; and that the jury in this case should not permit themselves to any extent to be influenced against the defendant because of, or on account of, such indictment."

The court denied these prayers, and appellant duly excepted.

Among others, the court granted appellant's prayer for instruction No. 8, as follows:

"8. The court instructs the jury that the law presumes the defendant innocent in this case and not guilty as charged in the indictment, and this presumption of innocence should continue and prevail in the minds of the jury until they are satisfied from the evidence, beyond a reasonable doubt, of his

guilt. This presumption of innocence is not a mere form to be disregarded by the jury at pleasure, but it is an essential, substantial part of the law of the land and binding on the jury in this case, and it is the duty of the jury to give the defendant the full benefit of this presumption and acquit him, unless they feel constrained to find him guilty by the law and the evidence, convincing them of his guilt, beyond a reasonable doubt."

A motion for a new trial, assigning the errors complained of, was overruled, and from the judgment of sentence this appeal has been duly prosecuted.

*W. P. Feazel,* for appellant.

1. There was error in the court's charge that no conduct of deceased, however violent, will justify the killing or reduce the grade to manslaughter. The use of insulting or abusive language will not necessarily cut out the right of self-defense, unless used for the purpose of provoking a difficulty and thereby furnishing an opportunity to slay. 93 Ark. 414; 73 *Id.* 400; 109 Am. St. 790; 67 *Id.* 603.

2. A man, when threatened with loss of life or great bodily injury, is compelled to act upon appearances and determine from the circumstances as to the course he should take to protect himself. 67 Ark. 603.

3. It was error to modify the twelfth instruction by amendment. 64 Ark. 147; 62 *Id.* 305; 59 Am. St. 171; 69 *Id.* 393; 8 *Id.* 488; 42 *Id.* 322.

4. The third request is sustained by 75 Ark. 249.

5. The punishment should be reduced to the minimum. 66 Ark. 519.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

1. Taking the instructions together, there is no error. The fifteenth properly states the law. 62 Ark. 309; 73 *Id.* 568; 73 *Id.* 568; 73 *Id.* 399; 93 *Id.* 414; Wharton on Homicide (3 ed.) 504-511.

2. The modification of the twelfth request for defendant was proper. 62 Ark. 305; 74 *Id.* 431.

WOOD, J., (after stating the facts). The court correctly declared the law on the degrees of homicide included in the

indictment, and at the instance of appellant gave his request in regard to voluntary manslaughter, and also declared the law applicable to self-defense.

In regard to the alleged use of insulting language, the court, at the request of appellant, gave the following instruction, 'towit:

"6.   Although you may believe from the testimony that just prior to the decedent's assault upon the defendant, if you find there was one, defendant used insulting and abusive language to or about the deceased in his presence and hearing, yet such language, however opprobious it may have been, would not justify an assault upon the defendant by the deceased; nor will it preclude the defendant from acting in his own self-defense, unless you further find from the evidence beyond a reasonbale doubt, that he used this language to or about the deceased for the purpose of bringing on an attack and an opportunity of killing the deceased or doing him some great bodily harm."

When these instructions are considered in connection with instruction No. 13, we are of the opinion that the use of the words "no language or conduct however violent" had reference to the language shown to have been used by Patterson just before he started towards appellant; for the court had told the jury, at the request of appellant, that "if they believed from the evidence that at the time the defendant inflicted the mortal blow or wound deceased was making a violent assault upon him, and defendant was induced or caused to strike said blow from a feeling of anger, fear or terror caused and produced by the deceased's assault upon him, then you can not convict him of anything higher than voluntary manslaughter."

The court also told the jury that "it is sufficient if you find from the evidence that it appeared to the defendant, at the time acting without fault or carelessness on his part, that the danger was so urgent and pressing that it was necessary for him to defend himself in the manner he did to prevent deceased from killing him or doing him some great bodily harm."

The court, by these instructions, told the jury, in effect, that any violent conduct on the part of Patterson which was sufficient to induce an honest belief on the part of appellant, acting without fault or carelessness, that he was in danger of

death or great bodily harm, was sufficient to entitle appellant to self-defense, or at least to have his crime reduced to a lower grade of homicide than that of murder.

The appellant did not point out the specific objection in the court below which he now urges to instruction No. 13, and the instruction, under the circumstances, should not be construed as in conflict with other instructions given by the court, but should be read in harmony with them; and the language to which objection is urged, when taken in connection with the immediate context and the other instructions, refers only to the language of Patterson, and not to his acts. The verbiage in question should have been met with a specific objection. If appellant had made such objection, the trial court would doubtless have corrected it or explained it as herein set forth.

Instruction No. 14 was abstract in that it assumed that Patterson "might have made threats against appellant," which actuated appellant, when there was no testimony in the record to warrant the conclusion that Patterson had made any threats against appellant. But the instruction, in this respect, could not in anywise have prejudiced the cause of appellant, for, if Patterson had made no threats whatever against appellant, his conduct in killing Patterson would be all the more unjustifiable.

There was testimony in the record tending to show that appellant had a grievance against Patterson because of the latter's alleged conduct in running appellant out of the warehouse. The testimony tends to show that appellant was making complaint against and abusing Patterson just before the fatal encounter. Instruction No. 14 was given to cover that phase of the testimony.

We are of the opinion, in view of the evidence tending to prove that appellant was angry with Patterson and had denounced him as an "old devil," and a "damned old son-of-a-bitch," and had said, "If he fools with me he will get his entrails cut out," that it was a question for the jury, in connection with his conduct in the store immediately preceding the killing, as to whether or not the appellant provoked and voluntarily entered into the combat, and that instructions numbered 15 and 16, presenting this phase of the case, were not erroneous.

If appellant entertained a grudge against the deceased, Patterson, as the proof tends to show, and used language in the hearing of Patterson for the purpose of provoking him to anger and causing him to bring on an attack whereby the appellant might have the opportunity of killing him or doing him great bodily injury, then appellant would not be excused or justified in the killing, and would be precluded from claiming the right of self-defense until he had in good faith withdrawn from the combat as far as he could and had done all in his power consistent with his safety to avoid the danger and avert the necessity of the killing. Here the uncontradicted evidence shows that the appellant willingly entered into the combat, and that he made no effort whatever at any time to withdraw from the same. The doctrine as announced by these instructions has been often approved by this court. *Wheatley* v. *State,* 93 Ark. 409; *Bishop* v. *State,* 73 Ark. 568; *Carpenter* v. *State,* 62 Ark. 286.

Instruction No. 16, when taken in connection with instruction No. 11, given at the request of appellant, is not open to the objection that it substitutes the judgment of the jury for the judgment of the appellant as to the necessity for taking the life of Patterson, as appellant contends. The instructions, taken together, correctly declared the law as announced by this court. *Magness* v. *State,* 67 Ark. 603.

Instruction No. 12, as asked by appellant, and as finally amended by the court, was entirely abstract, for there was no evidence to warrant the conclusion that the appellant was assaulted by Patterson with such violence as to make it apparently more dangerous for him to retreat than to stand his ground and resist the assault. There was no evidence whatever that the deceased assaulted appellant with the intent to murder him or to do him great bodily injury. As we have stated, the uncontradicted evidence shows that appellant voluntarily entered into the combat. The undisputed evidence, as we view the record, tends to show that Patterson was only attempting to engage in a fight with the appellant with his bare hands. He took off his coat as he started to the combat, and threw up his hands, showing that he had no deadly weapon, and none was found about his person. True, Patterson was much larger, and perhaps much stronger, than appellant;

but nevertheless there was nothing to indicate that he intended a deadly assault upon appellant or to do him great bodily injury. Therefore, the doctrine of standing one's own ground when attacked with a deadly weapon and slaying his adversary has no application. But, conceding that, as expressed in the amended instruction, the doctrine was erroneous, it was nevertheless not prejudicial, and, in fact, was more favorable to appellant than he had a right to ask or expect.

The court, having given the instruction, should have permitted appellant's counsel, if he desired, to argue the instruction as amended; but he did not make a specific request of the court to grant him such permission, and he can not complain here for the first time that it was error in not allowing him to argue the instruction as amended. It does not appear that he asked permission of the court to argue the instruction after it had been amended. If he had made such request, and the court had refused it, then he would have been in an attitude to have the alleged error reviewed here.

Appellant's prayers for instructions numbered 3 and 7, which the court refused, were covered by his prayers numbered 6 and 8, which the court granted.

It is insisted by the learned counsel for the appellant that there is no evidence to warrant a verdict for murder in the second degree, and that, even if there were, the punishment is excessive. The writer concurs in the view that imprisonment in the State penitentiary for eleven years under the evidence as disclosed by this record is excessive punishment, but the majority of the court is of the contrary opinion. Therefore the judgment must be affirmed.