McKINNEY v. STATE.

Opinion delivered November 17, 1919.

1. HOMICIDE—CONDUCT OF DECEASED—SPECIFIC OBJECTION TO INSTRUCTION.—In a homicide case the court instructed the jury that "no threats, language or *conduct*, however abusive, * * * will excuse" a homicide. Where the court instructed the jury on the theory of "appearance of danger," an objection to the above instruction for the use of the word *conduct*, should be made specifically.

2. HOMICIDE—UNJUSTIFIED KILLING—CONDUCT AND CHARACTER OF DECEASED.—Neither threats nor real or imaginary grievances, nor abusive language, however insulting, nor the bad character of deceased, will justify a killing.

3. HOMICIDE—DUTY TO RETREAT.—Where the accused brought on a difficulty, resulting in his killing the deceased, in order to invoke the doctrine of self-defense, he must, in good faith, abandon the difficulty, as far as possible, and do all in his power to avoid the danger, and avert the necessity of killing.

4. TRIAL—INSTRUCTIONS—ALL PHASES OF CASE.—It is impractical to cover all phases of a case in one instruction.

5. HOMICIDE—SELF-DEFENSE.—An instruction that if accused brought on an altercation with deceased, intending to kill him, and did

kill him, that he can not then plead self-defense, is proper, where the court in another instruction properly charged the jury upon the issue of self-defense.

6. Same—same—character of deceased.—An instruction that deceased's bad character would not justify a homicide, but that self-defense was the only justification, *held*, not prejudicial.

7. Trial—instructions—rejection—modification.—In a homicide trial, *held* certain instructions asked by defendant were properly rejected, and others properly modified.

8. Appeal and error—excluded testimony.—The exclusion of testimony can not be considered on appeal, where the record does not show what the answer of the witness would have been.

9. Evidence—character—specific acts.—Neither good or bad character can be proved by specific acts.

10. Criminal law—threats.—Threats are only admissible for the purpose of showing who is the aggressor in a conflict.

Appeal from Sevier Circuit Court; *Jas. S. Steel,* Judge; affirmed.

*Abe Collins* and *Lake & Lake,* for appellant.

1. It was error to give the 12th instruction for the State, as there was no testimony upon which to base it and ignores defendant's right to act in necessary self-defense.

2. It was error to give the 13th for the State, as there was nothing to show that defendant could have retreated, and it wholly ignores the fact that in case the assault is so fierce as to make it apparently as dangerous to retreat as to stand, it is not his duty to retreat but may stand his ground and if necessary to save his life or prevent great bodily injury, may slay his assailant. 49 Ark. 543.

3. It was also error to give the 14th for the State, as there was no evidence upon which to base it. No way is shown by which defendant could have avoided the danger to himself and have averted the necessity of the killing in case he honestly believed himself without fault or carelessness upon his part in arriving at such conclusion that the danger was imminent and pressing at the time of the fatal shot.

4. It was error to give the 18th for the State, as there was no evidence to sustain it or that defendant shot because of his bad character. It was highly prejudicial. 29 Ark. 248.

5. It was error to give the 19th, as it takes from the defendant the right to act upon appearances to him at the time and makes his right of self-defense depend upon whether or not deceased was offering to do defendant any injury at the time. 59 Ark. 132.

6. It was also error to give the 20th, because it cuts off defendant's right to act in necessary self-defense after having in good faith withdrawn from the conflict. 58 Ark. 544.

7. It was error to give the 21st for the State, for the reason that the jury should have been told that threats might be considered in determining the motives of deceased, as well as of defendant, instead of limiting them to the motives of defendant.

8. It was error to modify defendant's third request and give it as modified. 114 Ark. 398; 69 *Id.* 449.

9. It was error to refuse defendant's 4th request. It is the law and was not otherwise covered. It was also error to modify defendant's 7th request. 59 Ark. 132; 115 *Id.* 494.

10. It was error to refuse defendant's 10th request, as defendant had the right to go peaceably about his own business and was not required to neglect it.

11. It was also error to refuse defendant's 11th request, as it covers defendant's entire theory and is clearly the law.

12. It was error to modify defendant's 13th.

13. The court erred in excluding Joe Hammett's testimony and Mrs. Autry's, also Roy Selman's and defendant's, that deceased about a year before had cursed and abused and threatened him, etc.

*John D. Arbuckle,* Attorney General, and *Robert C. Knox,* Assistant, for appellee.

1. There was no error in giving or refusing instructions. 62 Ark. 307; 99 *Id.* 580.

2.  Instruction No. 14 was a proper one.  84 Ark. 121.  This instruction should be read in connection with Nos. 5, 6 and 9 given for defendant and state the law correctly.  100 Ark. 132.

3.  Nos. 18 and 19 were properly given, as was No. 20.  23 Ark. 130; *Smith* v. *State,* 139 Ark. 356; 114 Ark. 398.

4.  No. 21 was properly given.  119 Ark. 57.

5.  There was no error in refusing the defendant's instructions, nor in their modification.  104 Ark. 616; 93 *Id.* 409.

6.  There was no error in the testimony excluded and the verdict is amply sustained by the competent testimony.

### STATEMENT OF FACTS.

Will McKinney was indicted for murder in the first degree charged to have been committed by killing Jim Copass.  The facts are as follows:

According to the testimony of a witness for the State, Will McKinney shot and killed with a pistol, Jim Copass in front of a storehouse at Chapel Hill in Sevier County, Arkansas.  The killing occurred on Saturday morning at about 10 o'clock.  Copass with others was standing on a porch in front of the store when McKinney came up.  McKinney went on into the store walking behind Copass.  When he came up, McKinney said, "Howdy do."  Copass did not say anything.  While McKinney was in the store Copass went over and sat down by a telephone pole about 20 or 30 feet from the store.  McKinney stayed in the store for about five or ten minutes and then came out to where Copass sat.  When he got in about six or eight feet of Copass, McKinney asked him what he was hunting him with a 30-30 rifle for.  Copass said, "I wasn't hunting you with a 30."  McKinney replied, "Don't tell me that."  Copass repeated what he had said and further said, "Go, on, Will, I don't want to have any more trouble with you."  McKinney had his pistol in his right-hand pants pocket and began to pull it out.  He took the pistol in both of his hands and pointed it at Copass

and snapped it. Copass was beginning to rise when Mc-Kinney snapped the pistol at him and was a little better than half way up when McKinney shot him. The pistol fired immediately after it snapped. The bullet entered Copass' head right back of his ear and came out in his left cheek. The bullet wound resulted in the death of Copass.

According to the testimony of another witness for the State, Copass was sitting on a telephone pole and when McKinney got up to within eight feet of him he asked Copass why he had been looking for him with a 30-30 rifle. Copass replied, "I wasn't hunting for you with a 30." McKinney then said, "Don't tell me that." Then Copass said, "Go on, Will, I don't want any trouble with you." McKinney replied, "I know you don't." Just as he made this remark, Copass started to get up and as he did so, put his hands on his legs sliding them up towards his pocket. Copass began to get up just as McKinney reached for his pistol. The pistol first snapped and then fired. Copass was about two-thirds up at the time the pistol fired. McKinney was holding the pistol in both hands at the time he fired it. Copass did not put his hands in his pocket. He simply put them on his thigh as he started to get up. After Copass' death, his body was examined and no pistol or other weapon was found in his pockets or on his body.

Other witnesses who saw the killing corroborated the testimony of these witnesses.

Will McKinney was a witness for himself. According to his testimony he was foreman at a lumber camp and Copass was driving a team for the company. Copass first accused McKinney of making insulting remarks to his wife and threatened to beat him up. McKinney denied having made the remarks attributed to him and told Copass he had better quit and leave the camp if he thought any such thing. They had several quarrels about the matter which resulted in McKinney discharging Copass twice. Each time he took Copass back at the latter's request. When McKinney discharged him the third time he told him that he would not take him back any more.

After McKinney discharged him, they had a fight on Thursday afternoon. The killing occurred on the following Saturday morning.

On Friday preceding the killing McKinney was informed that Copass was hunting for him with a 30-30 rifle and was threatening to kill him. When McKinney walked in the store he spoke to all the crowd on the porch including Copass. Copass did not speak. McKinney wanted to have the matter settled without any further trouble and concluded he would go out to where Copass was and have a friendly conversation about it. As he approached Copass he said, "What were you hunting me with a 30-30 for?" Copass said, "I wasn't." McKinney said, "Don't tell me you wasn't hunting me with a 30-30." Copass then said, "Go on, Will, I don't want to have no trouble." When he said this he was sitting down on an old telephone pole and leaning against a telephone post. When Copass said, "Go on, Will, I don't want to have no trouble," he slammed his hand in his pocket and started to get up. When Copass started up, McKinney put his hand in his pocket and drew his pistol and threw it down on Copass. The pistol first snapped and McKinney pulled the hammer back and then it fired. Copass was facing McKinney and when the pistol fired he fell face downward. McKinney then turned around and walked back to the store porch. He said that he shot Copass simply because he thought Copass was going to shoot him or jump on him with a knife. The brother of Will McKinney corroborated his testimony.

Other witnesses for the defendant testified that Copass armed himself with a rifle after their first difficulty on Thursday and was looking for McKinney threatening to kill him. Some of the witnesses testified they communicated these threats to McKinney. Quite a number of witnesses testified that Copass bore the reputation in the community of being a quarrelsome, overbearing and turbulent man. Other witnesses testified that the reputation of McKinney was that of a quiet, peaceable and law-abiding man.

The jury returned a verdict of guilty of murder in the second degree and fixed the punishment of McKinney at five years in the penitentiary. The case is here on appeal.

HART, J., (after stating the facts. (1) The first assignment of error is, that the court erred in giving instruction No. 11, which is as follows: "You are instructed that no threats, language or conduct, however, violent, abusive or insulting, will excuse the taking of a human life, nor will it reduce the grade of homicide from murder to manslaughter."

It is claimed that the use of the word "conduct" takes from the consideration of the jury the doctrine of appearance of danger to the defendant. The court at the request of the defendant gave full and complete instructions to the jury on the doctrine of the appearance of danger and if counsel for the defendant thought that the instruction in question was misleading as ignoring that defense, it should have made a specific objection to the instruction. A similar objection was made in the case of *Manasco* v. *State,* 104 Ark. 397, and the court held that the verbiage of the instruction should have been met with a specific objection.

(2) It was also insisted that the court erred in giving instruction No. 12, which reads as follows: "You are instructed that if you find and believe from the evidence in the case, beyond a reasonable doubt, that the defendant, Will McKinney, killed the deceased on account of any real or imaginary grievance, which he might have had against the deceased, or on account of any threats the deceased might have made against him, or on account of any insulting language which the deceased might have used towards the defendant, or on account of the bad character of the deceased, or if you should believe beyond a reasonable doubt that he was actuated by all of these in killing the deceased, then you will convict the defendant of murder in the first or second degree, according as you may find and believe that he acted with or without

deliberation and premeditation when he killed the deceased.''

It is first claimed that the instruction is erroneous because there was no evidence tending to show that the defendant killed deceased because of any real or imaginary grievance or on account of any threats or insulting language or on account of the bad character of the deceased. The instruction would have been probably clearer to the jury if the court had instructed it that neither threats nor real or imaginary grievances, nor abusive language, however insulting, nor the bad character of the deceased would justify the killing. This is what the instruction means, and if counsel for the defendant thought that it was faulty in language they should have made a specific objection to the instruction, and, not having done so, they can not now complain.

In the next place it is claimed that the instruction is erroneous because it ignores the defendant's right to act in his necessary defense. As we have just pointed out, the instruction is not directed to that phase of the case. The court in other instructions fully covered the right of the defendant to kill deceased in his necessary self-defense, and in these instructions covered fully the doctrine of appearance of danger to the defendant.

(3) It is next insisted that the court erred in giving instruction No. 13, which is as follows: ''If you believe from the evidence in the case, beyond a reasonable doubt, that the defendant provoked or voluntarily entered into or that he sought out the deceased for the purpose of settling a difficulty, and, when he did so, brought on a difficulty and killed his assailant, he can not shield himself on the plea that he was defending himself. He can not take advantage of a necessity produced by his own unlawful or wrongful act after having provoked or excited or sought the attack, if you find from the evidence, beyond a reasonable doubt, that he did so, he can not be excused or justified in killing his assailant for the purpose of saving his own life or preventing great bodily injury, unless he had in good faith withdrawn from the combat

as far as he could, and did all in his power, to avoid the
danger and avert the necessity of the killing.''

The objection to this instruction assigned is that
there is nothing to show that the defendant could have
retreated and that it wholly ignores the fact that in case
the assault is so fierce as to make it apparently as dan-
gerous for the person assaulted to retreat as to stand, it
is not his duty to retreat.

According to the evidence of the State the defendant
approached the deceased and himself brought on the diffi-
culty. In such case he would have to in good faith aban-
don the difficulty as far as he could do so and do all in his
power to avoid the danger and avert the necessity of the
killing before he could justify the killing. *Carpenter* v.
*State,* 62 Ark. 286, and *Taylor* v. *State,* 99 Ark. 576.

(4) It is insisted that the court erred in giving in-
struction No. 19, which is as follows: ''You are in-
structed if you find from the testimony in the case, be-
yond a reasonable doubt, that the defendant and deceased
had a fight a day or so before the killing; that the de-
fendant heard that Jim Copass had threatened his life
and had been looking for him with a gun, and on that
account the defendant at the time and place mentioned
in the indictment, armed himself with a pistol, went out
to where the deceased was sitting, and shot and killed the
deceased at a time when the deceased was not offering to
do the defendant any injury, you will convict the defend-
ant of murder in the first or second degree as you may
believe he acted with or without deliberation and pre-
meditation.''

It is claimed that this instruction takes away from
the defendant the right to act upon the appearance of
danger to him at the time and makes his right to act in
his self-defense depend upon whether or not deceased was
offering to do defendant any injury at the time. We do
not think the instruction constitutes reversible error. As
we have already pointed out, the court at the request of
the defendant fully and completely instructed the jury on
the doctrine of appearance of danger. It has been fre-

quently said by the court that it is impractical to cover all phases of the case in one instruction. The instruction in question deals with an entirely different phase of the case. The object of the court in this instruction was to present to the jury the State's theory of the case. The defendant and the deceased had had a fight on Thursday before the killing occurred on Saturday morning. After the fight was over, the defendant heard that deceased had threatened his life and had been looking for him with a gun. The defendant admits in his testimony that he armed himself with a pistol on this account and that he went out to where the deceased was sitting and commenced to talk with him about their previous difficulties, intending to adjust them. The court was dealing with his right to kill under such circumstances and in using, in the instruction, the phrase ''when the deceased was not offering to the defendant any injury,'' meant to convey the idea to the jury, when the deceased was not apparently attempting to injure the defendant. In other words, in this instruction the court was again dealing with the theory of the State that the defendant armed himself and brought on the difficulty and shot the deceased at a time when the latter had not contemplated renewing the difficulty.

(5) It is insisted that the court erred in giving instruction No. 20, which reads as follows: ''If you believe from the testimony, beyond a reasonable doubt, that the defendant armed himself with a pistol, and sought out the deceased, Jim Copass, with the felonious intent of killing him, and sought out, brought on or voluntarily entered into a controversy with the deceased with the felonious intention of killing him, then the defendant can not plead self-defense, no matter how imminent the peril in which he found himself placed.''

It is claimed that this instruction cuts off defendant's right to act in his necessary self-defense after having in good faith withdrawn from the combat. There was no error in giving this instruction. Again the court was dealing with the theory of the State that the defend-

ant armed himself and voluntarily entered into a controversy with the deceased with the felonious intention of killing him. As we have already seen, the court fully covered the defendant's theory of self-defense in other instructions given to the jury and in another instruction given to the jury for the State, which is substantially the same as the instruction here set out, told the jury that if the defendant in good faith undertook to withdraw from the combat after having provoked it, that he might plead self-defense. If counsel for the defendant thought the instruction in question was faulty in the respect just stated, he should have made a specific objection to the instruction. This would have called the court's attention to the defect and the court would doubtless have corrected it to conform to the language of the other instruction on the same point given for the State.

(6) It is claimed that the court erred in giving instruction No. 18, which reads as follows: "You are instructed that, even though the defendant believed the deceased to be a man of bad character, this did not authorize the defendant to kill him; he could only kill him in self-defense as defined in these instructions."

The objection to the instruction is that it singles out the testimony and unduly emphasizes it. The court should not do this, but it has been held by this court that it is not error to do so where the court in other instructions presented to the jury for their consideration every phase of the case. In the case at bar the instructions to the jury were full and complete, and, when considered as a whole, we can not think that the jury were misled by the instruction complained of. *Hogue* v. *State,* 93 Ark. 316.

(7) Counsel for the defendant also calim that the court erred in refusing certain instructions for the defendant and in modifying others asked by him. We do not deem it necessary to set out these instructions. We have read and considered them. The matters embraced in the refused instructions are fully covered by other instructions given by the court. The modification of the

instructions consists in omitting certain parts of them as requested. The court was correct in doing this, for the modified parts were either a repetition of the part allowed to stand, or they presented the same matter in argumentative form.

(8) It is next insisted that the court erred in not permitting Mrs. Autry, a witness for the defense, to answer certain questions asked her. We need not set out the question for the record does not show what the answer of the witness would have been. In such a case the alleged error can not be considered on appeal. *Lincoln Reserve Life Ins. Co.* v. *Morgan,* 126 Ark. 615.

(9) It is next insisted that the court erred in refusing to allow defendant to testify that about a year before the killing the deceased had cursed him and threatened to stamp him into the earth because defendant had stated to the sister of the deceased that it was not Preacher Moss who had been arrested for disloyalty, but another Moss. It is insisted that this testimony was competent as tending to show the arbitrary and insulting character of the deceased. Neither good nor bad character can be proved by specific acts. *Campbell* v. *State,* 38 Ark. 498; *Shuffield* v. *State,* 120 Ark. 458, and *Biddle* v. *State,* 131 Ark. 537. This quarrel had no connection whatever with the killing and was too remote to be considered as shedding any light on it.

(10) The defendant stated on cross-examination that on Friday before the killing he asked deceased if he was going to bring his wife up to the trial at Chapel Hill the next day. He was further asked if deceased had not told him he would not do so, that it added more cost, that he had paid his fine for the fight they had had the day before and that so far as he was concerned it was over with. The defendant replied that no such conversation had taken place.

In rebuttal the State was allowed to prove by Roy Selman that he was present on the occasion just referred to and heard the deceased tell the defendant that there was no need of his wife coming up there the next morn-

ing for the trial and that he was through with the matter himself. Selman was a witness for the defendant and had testified that about 10 o'clock on Friday morning before the killing he had heard the deceased make the threat that he intended to kill the defendant. The defendant offered to prove by Selman that the conversation he heard between defendant and deceased as testified to in rebuttal was a conversation had before the threats which he had testified to in his examination in chief. They insist that it was material because it tended to show the state of mind the deceased was in. It may be said in the first place that the threats were only admissible for the purpose of showing who was the aggressor. The testimony of Selman that he heard the conversation in question between the defendant and the deceased was only admitted for the purpose of impeachment and the court so stated at the time the excluded testimony of the witness was offered. The excluded testimony would have been relative to a collateral matter and the court was right in not admitting it to go to the jury.

We have carefully examined the record and find no prejudicial errors in it. It follows that the judgment must be affirmed.