## COATS v. STATE.

### Opinion delivered October 30, 1911.

1. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—The jury are the judges of the weight of the evidence in criminal cases, and their verdict is conclusive on appeal where there is substantial evidence to support it. (Page 57.)

2. HOMICIDE IN RESISTING ARREST—EFFECT OF MISNOMER IN WARRANT. —It is competent, in a prosecution for murder committed in resisting an officer, to prove that the officer had a warrant which was intended for defendant, though he was misnamed therein. (Page 58.)

3. HOMICIDE—JUSTIFICATION—RESISTANCE OF UNLAWFUL ARREST.— One is not justified in killing an officer in resisting an illegal arrest unless he is in danger of losing his own life or receiving great bodily harm. (Page 59.)

4. JUROR—DISQUALIFICATION.—The mere fact that one of the jurors ran a gasoline boat for the persons who searched for decedent's body did not disqualify him from serving on the jury. (Page 60.)

5. SAME—MISCONDUCT.—The fact that a juror talked over the telephone during the time the case was on trial will not be such misconduct as would entitle defendant to a new trial where the other jurors were

present when the conversation took place, and testify that nothing was said about the case. (Page 60.)

6. APPEAL AND ERROR—DISCRETION AS TO OPENING STATEMENT.—The latitude allowed to counsel in the opening statement is largely within the discretion of the trial court, but is subject to review on appeal where there is a manifest abuse of its exercise. (Page 60.)

7. SAME—HARMLESS ERROR.—Error in permitting the prosecuting attorney in his opening statement in a murder case to exhibit to the jury a map of the place of the killing was harmless where there was no dispute as to the place where the killing took place, and where the prosecuting attorney offered to strike out the map so objected to. (Page 61.)

Appeal from Mississippi Circuit Court, Osceola District; *Frank Smith*, Judge; affirmed.

Appellant *pro se.*

1. The court erred in permitting the warrant issued for Bill Smith to be read, when there was no information connecting appellant with Bill Smith. 153 U. S. 78; Fourth Amendment, Const. U. S.; 8 Cyc. 1082-1086.

2. The case should be reversed for improper conduct of the jurors, Hayes, Wood and Mathews. 34 Ark. 341; 26 Ark. 334; *Id.* 332; 66 Ark. 545; 52 S. W. 276; 17 S. W. 3; 35 Ark. 639; 20 Ark. 53; 13 Ark. 317.

*Hal L. Norwood*, Attorney-General, and *William H. Rector*, Assistant, for appellee.

1. There is sufficient testimony to connect appellant with the Bill Smith mentioned in the warrant. If the warrant was legal and fair on its face, the officers were protected by it. If it was intended for appellant in fact, it was legal, although he may have been misnamed therein, and it would authorize his arrest, and if in resisting arrest he killed the arresting officer, he was guilty of murder in the first degree. Wharton on Homicide, §§ 391-394, incl.; 1 Bishop's Crim. Proc., § 187; 95 Ark. 185, and authorities cited; 61 Ark. 592. See also 53 Ark. 518.

2. Since there was no separation of the jurors at any time shown, there was no burden upon the State to show that the conduct of the jurors complained of resulted in no improper influence being brought to bear upon them; yet the State did show, voluntarily, that the integrity of the verdict was not

affected by any act or conduct on the part of any of the jurors. 29 Ark. 248; 20 Ark. 50; 73 Ark. 510.

HART, J.   Henry Coats was indicted, tried before a jury, and convicted of the crime of murder in the first degree.   From the judgment of conviction he has duly prosecuted an appeal to this court.

R. L. Ferguson was the city marshal of Osceola, and also deputy sheriff of Mississippi County, Arkansas.   On the afternoon of April 3, 1911, in company with Bob Dean, also a deputy sheriff of Mississippi County, he attempted to arrest the defendant, Henry Coats, which resulted in the death of Ferguson and the wounding of Dean.   The officers had two warrants, one against T. L. Wells, and the other against Bill Smith, charging each of them with the illegal sale of whisky in Mississippi County.   The warrant against Bill Smith was the one used by the officers in attempting to arrest the defendant.

Robert Dean was the principal witness for the State, and testified as follows:

"Ferguson and I went to the Mississippi River near Golden Lake, or Idaho Landing, some twelve miles or more from Osceola.   We understood that the persons named in the warrants and charged with selling whisky without license were engaged in the business on an island in the Mississippi River opposite the place where we went.   When we got there, I told Ferguson to go down the bank, and call the parties over; that they would not come if they saw me.   As Ferguson went down the bank, the defendant, Coats, and his wife and four small children had just landed on the Arkansas shore to pick up a passenger.   Ferguson said, 'Come ahead,' and I went on down the bank.   Coats was in a gasoline boat by himself.   Tied to this boat was a skiff which was occupied by Mrs. Coats and her children.   The skiff was next to the bank, and there was an eddy in the river there.   After some conversation, Ferguson told Coats he had a warrant for him, and Coats said, 'Read it,' and then Ferguson handed the warrant to me, and I began to read it.   I read to him the warrant for the arrest of Bill Smith. Coats said that he couldn't go, and Ferguson asked him, 'Why.' Coats replied that his wife was over here, and he couldn't go without taking her back to the island.   He made other excuses about not going with us.   I was acquainted with Coats, and

said to him: 'Henry, you don't mean to say you are going to resist.' He talked on and said, 'You have the best of me,' and kept on talking. Ferguson said: 'We have got to take you.' He started to step in the boat, and, just as he did so, Coats, who was lying in the boat 'kind o' on one side, and his shoulder against the other side of the boat, went back this way (indicating), and came up with a pistol, and shot Ferguson. Ferguson fell, and I think Coats must have shot him in the stomach. Coats shot four or five times, and Ferguson two or three times. Ferguson was a right-handed man, and his right hand was in his pocket, when Coats first shot him. I tried to shoot Coats, but could not get my pistol to work for some time. As Ferguson fell, Coats turned, and shot me in the jaw, and as I fell I shot at him. As I lay on the ground, he came up to shoot me again. I said: 'You have done enough, Henry,' and he quit. Coats then said, 'Boys, I hated to do it, but I couldn't be arrested,' and he went off kind o' laughing or smiling. He told the boy whom they had come after to shove off the skiff as quickly as he could, saying, 'There will be a crowd here in a few minutes.' As he went off, he waived his hand to me. When Ferguson fell, I think his right hand caught the rope, and his left hand caught on the skiff by the side of the gasoline boat. He had a death grip on it, and when they pushed out in the water about ten feet, Coats took the oar, and pushed Ferguson's hand loose from the boat. While Ferguson's body was floating around, I said, 'Henry, please put him back on the bank,' but all Coats would say was: 'Boys, I hated to do it, but I couldn't be arrested.' I was never unconscious at any time after or during the shooting. I finally made to a place where I could procure assistance. I was then taken to a hospital at Memphis, Tenn.'' On cross examination, Dean admitted that he had been indicted for gambling, selling whisky, and carrying a pistol, and had paid a fine for each of these offenses. He said, however, this was about three years before. It is also shown that Dean had been convicted of grand larceny, and had been pardoned. On cross examination, he said that he didn't make any statement in regard to the killing to one Edgar Smith. He specifically denied that he told Smith that Coats offered to give up, and that Ferguson would not let him, or that Coats was justified in shooting Ferguson.

Henry Coats, the defendant, testified: "When Ferguson first accosted me, he asked me how long it would take to get to the whisky and get back. I replied: 'About half an hour.' He said: 'I want to go over, and there are some other boys that want to go with me.' He then went up the bluff part of the bank, and said: 'All right, boys.' He came back down, and Dean followed him. I did not know Ferguson, but knew Dean. When they came back, Ferguson drew a pistol, saying: 'There is no use to go any further; you come out of the boat.' I said: 'Who are you?' and he replied: 'I am Hall, the high sheriff of Osceola.' I said: 'Have you got a warrant for me?' and he replied, 'I have.' I said: 'Read it, and let me see what you have got me charged with.' He pulled the warrant out and turned to Dean, saying, 'Bob, read this; I can't.' I said: 'What, the high sheriff can't read a warrant?' and he didn't make any reply to that. Bob Dean commenced to read the warrant to me, and when he got to the name of the person to be arrested he said: 'What's your name?' I said: 'You have it on the warrant, haven't you?' He said: 'Your name is Henry Coats, all right.' I said: 'Sure, Bob, you know me personally, and you know my name, and you knew you could read my name if you seen it.' Ferguson said: 'You don't have to read that to him,' and said to me: 'I say for you to come out of that boat.' I was sitting in the boat, and said: 'I want to see you; I don't mean any fighting, but I want to talk this matter over with you.' I crossed my legs and locked my hands over them and said; 'I have my wife and family in here; and if the charge is a whisky bill, Bob knows I wouldn't run or have any trouble.' I tried to get them to let me take my wife and children back before they took me. I told them there was a storm brewing, and I was afraid for them to be on the river alone. Ferguson said: 'We have got nothing to do with your wife or children. I am after you, and am going to have you.' I replied: 'Well, if I have got to go I can't help it; I have stated all I can do; I have offered everything I can offer; I have a gun on me that I want to lay off. I am coming out with you, and don't want the gun on me.' Ferguson did not say anything, but when I got the gun opened fire. I returned the fire, and when I saw Ferguson fall his pistol slipped away from him, and I quit shooting at him. Dean was shooting

at me, and I turned, and shot at him. As he fell, he said, 'Henry, don't shoot me any more,' and I said, 'Bob, throw your pistol away from you; I don't want to kill you.' He threw his pistol back, and I commenced to start my engine to leave there. I did not take an oar and push Ferguson's hand off the skiff."

On cross examination, he admitted that he had been selling whisky on the island in the river; that he had United States revenue license, and did not have license from either the State of Tennessee or of Arkansas, and that he didn't know whether it was unlawful to sell whisky at the place where he was selling it in either of those States.

Sophia Dale testified that she passed the scene of the shooting about half past four o'clock in the afternoon of the day of the killing. She heard two coarse shots, and four, five, or six fine shots. She was about a hundred yards away from the scene of the killing. Other evidence showed that Coats used an automatic pistol which could be emptied in ten seconds. The reports of the pistol fired by Ferguson made a louder noise than that used by Coats.

The defendant introduced several witnesses who testified that Robt. Dean's reputation for truth and morality was bad, and some of them stated that, from that reputation, they would not believe him on oath. Edgar Smith testified that on the 7th or 8th day of April, 1911, he delivered a package at the hospital where Robt. Dean was being treated; that he went into the room where the physician was dressing Dean's jaw to deliver the package; that the physician went out of the room for some purpose, and that while he was gone Dean told him that Coats offered to give up, and Ferguson wouldn't let him. He also said that Coats was justified in shooting Ferguson. In rebuttal, Bob Dean denied having this conversation with Smith, and it was also shown that no one would be admitted in the operating room while the patient was being operated on except the physician or relatives of the patient. Other witnesses said that on the 7th or 8th of April in question Dean could scarcely speak at all. Other witnesses for the State testified that the reputation of Dean for truth and morality in the community where he lived was good, and that they would believe him on oath under any circumstances.

It will be noted that the only two persons who testified. about the killing are Dean and the defendant. They flatly contradict each other. An effort was made by the defendant to impeach Dean's testimony, but he didn't succeed in convincing the jury that Dean was not a credible person. The jury by their verdict show that they didn't believe the testimony of the defendant, and gave full credence to that of Robert Dean.

Dean testified that Coats, after parleying with them, told them that he could not go with them, and, when asked if he was going to resist arrest, evaded the question, and kept on talking. Ferguson finally informed him that he would have to arrest him, and started to step in the boat for that purpose. Coats at once drew his pistol, and shot Ferguson. Dean says that Ferguson at the time was not trying to shoot the defendant.

Coats was engaged in the unlawful sale of whisky, and says he did not think the State of Arkansas had any jurisdiction over the island where he was selling the whisky. He first tried to get the officers to go over to the island with him on the pretext that he wanted to take his wife home, on account of a storm being about to come up. Dean says there was no storm brewing. Not succeeding in this, he made an excuse that he was not dressed fit to leave there, and, as above stated, when he finally saw that the officers intended to arrest him, he immediately pulled out his pistol, and opened fire on them.

The jury might have inferred from the evidence that the defendant did not care whether or not the officers had a warrant for his arrest; that he was engaged in the unlawful sale of whisky, and intended to defy the laws, and to continue his illegal business; that he intended to resist arrest at all hazards, even to the extent of killing the officers who came to arrest him, if it became necessary to prevent his arrest.

The killing under such circumstances evinced a depraved mind, regardless of human life, and showed that he acted with malice and premeditation, and was guilty of murder in the first degree.

We deem a more detailed discussion of the evidence unnecessary. It is sufficient to say that the testimony of Robert Dean, when considered in the light of the other evidence, was sufficient to support a verdict of murder in the first degree.

The jury were the judges of the weight of the evidence and the credibility of the witnesses, and, according to the well settled rule in this State, their verdict is conclusive on appeal where there is substantial evidence to support it.

2.  It is next contended by counsel for the defendant that the court erred in allowing the warrant issued for Bill Smith to be read in evidence because there was no proof showing that there was any connection between Bill Smith and the defendant, Henry Coats.  Upon this issue, we quote from the testimony of Robert Dean as follows:

"Q.  When did you first learn that you wanted to arrest Coats?  When you got down to the river?  A.  Yes, sir; before we got down there; they had told us who it was that was coming over there.  Q.  You knew Coats was coming over there?  A.  Yes, sir; that was the man I knew they wanted. The one that had that blind tiger.  Q.  You didn't know, when you left Osceola, whom you were going for?  A.  I knew we were going after Wells and the fellow that run the blind tiger.  Q.  Known as Billy Smith?  A.  Yes, sir; that was the name that they said he gave.  Q.  That was a fictitious name?  A.  Yes, sir; that was the name they said he was going under."

And on page 189 the following is found:

"Q.  You understood that the warrant you were carrying was for the man operating the gasoline boat in front of Golden Lake?  A.  Yes, sir.  Q.  And when you got there you found it was Henry Coats?  A.  Yes, sir."

Section 2232 of Kirby's Digest reads as follows:

"An error as to the name of the defendant shall not vitiate the indictment or proceedings thereon, and if his true name is discovered at any time before execution, an entry shall be made on the minutes of the court of his true name, referring to the fact of his being indicted by the name mentioned in the indictment," etc.

Section 2496 provides that "the provisions of law regulating proceedings in the circuit court in criminal cases, so far as applicable, shall govern the trial, verdict, judgment and execution in justices' courts except as herein otherwise provided."

The object of the statute is that whenever the person who is really meant is indicted or arrested, though by a wrong name,

the proceedings are not thereby invalidated, but that the error in the name may be corrected.

We think it appears from the testimony of Robert Dean that the warrant was for the person operating the gasoline boat in front of Golden Lake on the Mississippi River, and that the defendant, Henry Coats, was that person. His true name was not known when the warrant was issued, and it was then supposed that he was named Bill Smith. It sufficiently appears, however, that the defendant was the person intended to be designated in the warrant, and for whose apprehension the warrant was intended. The proof shows that the warrant was issued for the arrest of the defendant, and we are of the opinion that, under our statutes quoted above, the warrant was not void. The statute was doubtless enacted to cover just such cases as this.

3. Counsel for defendant insist that the court erred in modifying certain instructions asked by them. We do not deem it necessary to set out the instructions in question. It is sufficient that, if given in the language required, they would have warranted the jury in acquitting the defendant, even though it might have appeared to the jury that he used more force than appeared to be reasonably necessary to him in resisting the arrest. This is not the law, even in the case of a illegal arrest. An illegal arrest is no more than a trespass to the person. "The attempt to take away one's liberty is not such an aggression as may be resisted with death. Nothing short of an endeavor to destroy life will justify the taking of life." 1 Bishop's New Criminal Law, § 868; *Creighton* v. *Commonwealth*, 84 Ky. 103, 4 Am. St. Rep. 193; 25 Am. & Eng. Ency. of Law, p. 278 and cases cited; Wharton on the Law of Homicide (3 ed.), § 407; *Robertson* v. *State* (Fla.), 52 L. R. A. 751.

Mr. Bishop says that the reason why a man may not oppose an attempt on his liberty by the same extreme measures permissible in an attempt on his life may be because liberty can be secured by a resort to the law.

So it appears that, even in a case where the defendant kills an officer in resisting an illegal arrest, he can only oppose force with force as in other cases where he is assaulted; and if the circumstances of the killing show that he acted with malice

and premeditation, he is guilty of murder in the first degree. In short, he is placed in no better position than is any other person assaulted, and can only kill his assailant when the danger appears to him as a reasonable person so urgent and pressing that he is in danger of losing his own life or receiving great bodily injury.

4. The fifth assignment of error is the alleged improper conduct of the jurors, Hayes, Wood and Mathews. The latter was a member of the regular panel. It was developed during the trial that he went with some persons to hunt for Ferguson's body, and that the killing was discussed on the trip. Mathews says that he was the owner of the boat, and only went along to run it; that he was employed at the gasoline engine, and heard but little discussion of the case. He stated that, when he was examined on his voir dire, he was not asked about this trip, and forgot to state it himself. He had answered the usual questions propounded to the jurors, and we do not think the fact that he ran the boat for the persons who went to hunt for the body of Ferguson disqualified him from serving on the jury. In this connection, it is also objected that jurors Hughes and Wood had conversations with persons over the telephone. The jurors testify that all were present when the conversations over the telephone took place, and nothing whatever was said about the case on trial. Hayes went home and talked with his son, who was in bed sick, but the other jurors were just outside the door, which was open, and no conversation was had about the case. The juror was only concerned about the illness of his son.

5. It is argued by counsel for defendant that the court erred in permitting the prosecuting attorney to exhibit to the jury, in his opening statement, a map on which they designated places to be known as whisky boats, others where "boot-leggers," and the place where Ferguson was shot as the place where the bootlegger resisted arrest, and killed Ferguson. The map was not afterwards introduced in evidence. The object of the opening statement is to give the jury an outline of the evidence to be introduced and the nature of the issues to be tried. Counsel have no right to rehearse facts which can not be introduced in evidence, and the court should not allow counsel to state matters foreign to the issues, and which have a

tendency to excite the prejudice of the jury.  The privilege allowed to counsel in this regard is largely within the discretion of the trial court, but is subject to review on appeal where it appears that there is a manifest abuse of its exercise.

The defendant admitted that he and one Wells procured a United States revenue license, and engaged in the business of selling liquor on an island in the Mississippi River.  He ran a boat for the purpose of bringing customers to and from the Arkansas and Tennessee shores.  He never attempted to get a license from either of the States mentioned, and says that he does not know whether the sale of whisky was prohibited there or not.  The place where Ferguson was killed was undisputed.  The matters complained of were all undisputed, and we can not see how the defendant was prejudiced.  Besides, the prosecuting attorney offered to strike out the matter that was objected to.

We have carefully considered the record.  The instructions of the court were full and fair to the defendant.  The evidence was sufficient to support the verdict, and the judgment will be affirmed.

KIRBY, J., dissents.