## JOHNSON *v.* STATE.

### Opinion delivered February 26, 1917.

1. HOMICIDE—FIRST DEGREE MURDER—SUFFICIENCY OF THE EVIDENCE—In a prosecution for homicide, the evidence held sufficient to warrant a conviction for first degree murder.
2. EVIDENCE—CREDIBILITY OF WITNESS—BELIEF OF ONLY PORTION OF TESTIMONY.—Although a witness is found to have testified falsely to a material fact, the jury will not be warranted in disregarding other parts of his testimony which appear to be true. It is the jury's duty to accept such portions of a witness's testimony as they believe to be true, and to reject the part that they believe to be false.
3. INSTRUCTIONS—MULTIPLICATION ON SAME POINT.—The trial court is not required to multiply or repeat instructions on the same point.
4. APPEAL AND ERROR—FAILURE TO OBJECT TO INSTRUCTIONS—CAPITAL CASE.—Even in capital cases, a judgment will not be reversed for the giving of an erroneous instruction, which was not objected to in the trial court.

Appeal from Desha Circuit Court; *W. B. Sorrells*, Judge; affirmed.

The appellant *pro se.*

1. The verdict is contrary to the evidence. Joe Corporeau was the only eye-witness intrduced by the State. If his statement be true, appellant was justified in killing the deceased. The other eye-witness testified that appellant never fired a shot.

2. The court erred in its instructions given and refused. Some of those given were prejudicial. Others do not correctly state the law. Those refused should have been given. From the evidence, Joe Corporeau either killed appellant or was an accomplice and it was error not to give an instruction touching the credibility of an accomplice. Kirby's Digest, § 2384.

*John D. Arbuckle*, Attorney General, and *T. W. Campbell*, Assistant, for appellee.

1.    The testimony is conflicting and the finding of the jury is conclusive. · 95 Ark. 172; 104 *Id.* 162; 101 *Id.* 51; 100 *Id.* 330; 103 *Id.* 4.    The verdict is amply sustained.    92 Ark. 586; 66 *Id.* 53.

2.    The instructions refused are covered by others given.    56 Ark. 4; 62 *Id.* 494; 72 *Id.* 384; 73 *Id.* 425; 103 *Id.* 505.

If part of an instruction is good and part bad, it is proper for the court to refuse the whole.    13 Ark. 317; 62 *Id.* 543; 92 *Id.* 71; 86 *Id.* 456, and others.    The latter part of No. 3 asked by appellant is erroneous.    The law provides two ways of impeaching a witness—one by proving that he has made different statements, and the other by evidence that his reputation for truth and morality renders him unworthy of belief.    Kirby's Digest, § 3138; 102 Ark. 302.

3.    No objections were made to the giving of the others refused.    103 Ark. 505.    The action of the court in giving instructions is not set up in the motion for new trial.    80 Ark. 345; 101 *Id.* 120.

HART, J.    Aaron Johnson was indicted for the crime of murder in the first degree charged to have been committed by killing R. L. Rutherford.    The indictment was returned by the grand jury of Jefferson County where the alleged crime was committed and the defendant was granted a change of venue to Desha County.    He was tried before a jury which returned a verdict of guilty of murder in the first degree, and he was sentenced to death.

From the judgment of conviction defendant Johnson has duly prosecuted an appeal to this court.    The facts are substantially as follows:

R. L. Rutherford was a white man who owned a plantation in Jefferson County about seven miles south of the city of Pine Bluff.    The defendant, Aaron Johnson, Joe Corporeau, Charley Corporeau, his son, and Dilcian Corporeau, his mother, were all colored people

and were tenants on the Rutherford farm during the year 1916. R. L. Rutherford was killed on the morning of September 19, 1916, while driving a buggy over his plantation.

Dr. H. E. Williams, the coroner of Jefferson County, testified that he examined Rutherford's body and found three bullet wounds, one about one inch below the right shoulder blade, ranging to the left, one to the left and up and one below the left shoulder blade, ranging upward and forward. In addition to these wounds Rutherford had been shot with a shotgun and his body was strewn with shot from the edge of his hair down below the waist. Three or four shots penetrated his left eye. The gun shot wound was on the front part of his body and the pistol wounds were in his back. Doctor Williams testified that he had been practicing medicine nearly thirty-six years and that either of the wounds found in the back of Rutherford's body was sufficient to have caused his death.

W. S. Steed, a citizen of Pine Bluff testified that he saw R. L. Rutherford and Aaron Johnson standing talking on the streets of Pine Bluff on Monday afternoon before Rutherford was killed on Tuesday and heard a part of what they said; that Rutherford did not talk very loud, and that he did not understand much that he said, but understood enough to know that he was talking to Johnson about having sold some cotton seed on the Saturday before and having disposed of the money instead of paying it to Rutherford on a wagon and team for which Johnson owed Rutherford. The witness stated that Rutherford was reprimanding Johnson in a mild way and that his attention was attracted by Johnson speaking abruptly to Rutherford and striking his fist against his hand in Rutherford's face and saying to Rutherford, "By God, because you are a white man and I am a negro, you can not run over me. I will see you tomorrow."

Sam M. Goldstein testified that he was engaged in the brokerage business in Pine Bluff, Arkansas, and sold Aaron Johnson a pistol on the afternoon before

Rutherford was killed. He stated that Johnson came into his place of business and went out again; that Johnson stated he was going to see his boss and that he came back later on in the day and purchased a .38 caliber pistol and five cartridges to put in it. A pistol was exhibited to the witness which he identified as the one he had sold Johnson, and he stated that the pistol was powder marked, which indicated that the pistol had been shot since it left his store.

J. L. McBurnett, a deputy sheriff of Jefferson County, arrested Aaron Johnson in Jefferson County about a mile and one-half from the scene of the killing on the next evening after the killing. Johnson at the time was at the house of one George Ashley, and G. W. Marks. He had a .38 caliber pistol, which was taken possession of and kept by the sheriff until the date of the trial. This was the pistol which was exhibited to the witness Goldstein. When Johnson was arrested, he was shot through the left hand. His pistol was loaded at the time he was arrested. It was also shown that the pistol had not been fired since it came into the hands of the deputy sheriff.

Dilcian Corporeau testified that she was 79 years old and that Aaron Johnson came to her house on the morning before Rutherford was killed. She said that Johnson told her that he expected that he and the boss man would have a fuss that day; that if the boss throwed up anything to him that he would get him or the boss would get him, one; that Johnson stated that he would fix him today (referring to Rutherford); that she advised him to not do that; that Johnson said he liked to have killed him last year, and she thinks he said, that he wished he had done it, that R. L. Rutherford was the man referred to as the boss.

Joe Corporeau testified that R. L. Rutherford drove into the field where he and his son Charley and Aaron Johnson were picking cotton; that Rutherford was in a buggy and driving his horse along in a walk; that he spoke to them as he drove up and asked them about their crops and how they were getting along;

that then Rutherford asked Aaron to let him see him for a few minutes and drove off something like between 25 and 50 yards; that Rutherford and Johnson talked a little bit and finally got to talking loud enough for him to hear them; that Rutherford said, "I understand you gave Mr. Stockwell sass about putting some hands in your field," Johnson replied: "I did, Captain, you know Mr. Stockwell ain't nothing but a God damn poor white man." Johnson said further: "No white man ain't going to put no hands into my field." After talking a little longer, Rutherford told Johnson that he would put some hands in his field, and Johnson replied: "You or no other God damn man won't put no hands in my field," and from that they started cursing. Witness said he then called to Aaron to stop and Aaron's wife began to scream at him; that Aaron then said to his wife, "Shut up your mouth, God damn you; I will come down there and beat hell out of you; that is the reason white folks beats niggers out of what they makes on account of your mouth." That Mr. Rutherford then said: "I don't want to beat you out of anything;" that Johnson then said, "It looks very much like it," and stated further: "You beat me out of a bale of cotton and got a bale of cotton seed last year;" that Rutherford started to move and Johnson said, "Come down out of the buggy, white man, God damn you, and fall on your face;" that he told Aaron to stop cursing him; that Aaron kept on cursing Rutherford and directly Rutherford said, "Stop cursing me; if you don't stop, I will kill you." The witness then said that they seemed to stop, but that Johnson started up again and called Rutherford a God damn son of a bitch; that Rutherford made a move and that as he did so, Johnson fired; that the horse then moved and that the movement of the horse threw Rutherford's face to the east, the horse's head being to the west; that Johnson made two more shots and said, "God damn me, if I had the balls, I would put some more balls in him," and then left. The witness was asked who fired the first shot, and stated that Aaron shot first. He said that he had

never had any trouble with Rutherford himself, and had nothing to do with the shooting. He admitted that the shotgun was taken from his house, and said that it was claimed that his son Charley shot Rutherford with it. Charley Corporeau left the county after the killing. Rutherford fell out of the buggy on his face after he was shot, and expired at once. A pistol was found near his body, which was fired. Joe Corporeau helped to carry his body to a house nearby.

The defendant Johnson testified in his own behalf and denied shooting Rutherford. He stated that Joe Corporeau and his son Charley shot him; that they were angry at Rutherford because he had complained about the way they were doing on the farm. He made a detailed statement of how the killing occurred and denied that he had anything to do with it.

Monroe Adams, a colored man who also lived on the Rutherford place, testified that he heard the shooting and looked after the first shot and saw Johnson running toward his house and thought they were shooting at him; that the smoke from the gun looked like it was Joe Corporeau who was doing the shooting; that one shot was made from the right and one from the left side, and that he never saw Johnson shoot at all.

In rebuttal it was shown that this witness had stated to the officers after the shooting, that he was down in the field gathering corn and did not know anything about the shooting at all.

Leroy Johnson, the 14-year-old son of defendant, testified that he was down in the field when the shooting took place and saw Joe Corporeau shoot Rutherford with his pistol, and that Charley had a gun and shot at Rutherford with it; that his father never shot at all. He admitted on cross-examination that he told the deputy sheriff he did not see any of it at all, but said that he was scared because Joe Corporeau was telling what he would do if the witness told anything on him. It was also shown that the reputation of the defendant for truth was good.

George Ashley and G. W. Marks testified that they saw and talked with Johnson the day after Rutherford was killed.

Ashley stated that Johnson told him that he shot at Rutherford five times, but did not know whether or not he had hit him five times. Marks stated that Johnson told him he had shot at Rutherford five times.

It is earnestly insisted by counsel for the defendant that the evidence was not legally sufficient to warrant the verdict for murder in the first degree. We do not agree with counsel in this contention. Of course, if the jury believed the testimony of Johnson, and that of his son and of Monroe Adams they would have found him not guilty, because it appears from their testimony that Rutherford was shot by Joe Corporeau and his son, and that Johnson did not have anything to do with the killing.

The testimony of Monroe Adams was contradicted by that of the deputy sheriff who went down there to make an investigation on the day Rutherford was killed. He talked with Monroe Adams about the killing and Monroe told him that he did not know anything about it. Johnson's son also admitted that he had told the officers on that day that he did not know anything about the killing. The jury were the sole judges of the credibility of the witnesses.

It appears from the evidence adduced by the State that Johnson shot Rutherford in the back with his pistol, and that Charley Corporeau shot him with the shotgun; that Rutherford fell out of the buggy on his face; that Johnson stated that if he had any more cartridges in his pistol, he would shoot him again. Johnson threatened to kill Rutherford just before he did shoot him. He told Dilcian Corporeau before Rutherford got there that morning that he intended to kill Rutherford or Rutherford would kill him. He had threatened Rutherford the afternoon before on the streets of Pine Bluff.

(1) The evidence adduced by the State tended to show that the defendant formed a specific intent to

kill Rutherford and that the shooting was done after deliberation and with premeditation. In other words, the jury might have found from the evidence that the killing was the result of a previously formed design to kill growing out of the ill will on the part of Johnson to Rutherford. The evidence was legally sufficient to sustain a conviction of murder in the first degree. *Strong* v. *State*, 85 Ark. 536; *Kinslow* v. *State*, 85 Ark. 514; *Ferguson* v. *State*, 92 Ark. 120; *Coats* v. *State*, 101 Ark. 51; *Rosemond* v. *State*, 86 Ark. 160; *King* v. *State*, 117 Ark. 82.

It is insisted by counsel for the defendant that the judgment should be reversed because the court refused to give instruction No. 3, asked by the defendant. The instruction reads as follows:

"The court instructs the jury, that they are the sole judges of the facts in this case, and of the credit to be given to the respective witnesses who have testified; and in passing upon the credibility of such witnesses who have testified they have a right to take into consideration their prejudices, motives or feelings of revenge, if any such has been proven or shown by the evidence in the case; and if the jury believe, from the evidence, that any witness or witnesses have knowingly and wilfully testified falsely as to any material facts in the case for the purpose of shielding his or herself from prosecution, the jury are at liberty, unless corroborated by other evidence, to disregard the testimony of such witness or witnesses *in toto*."

(2) There is no objection to the first part of the instruction, but it is the settled rule in this State that if any portion of the requested instruction is bad, the trial court may refuse to give the instruction. The instruction might be construed as warranting the jury in disregarding testimony which they believed to be true if it came from a witness who had sworn falsely to some other material fact. Thus construed it does not reflect the law, for although a witness is found to have wilfully testified falsely to a material fact, the jury will not be warranted in disregarding other parts

of his testimony which appear to be true. In other words under the latter part of the instruction it might appear to the jury that if any witness had wilfully testified falsely concerning any material fact, it was their duty to disregard his whole testimony unless corroborated by other evidence regardless of the fact of whether they might believe the remaining part of his testimony. The jury had the right to believe such portions of any witness's testimony as they believed to be true, regardless of the fact of whether they believed other portions of it. In short, it was their duty to accept such portions of the witness's testimony as they believed to be true, and reject that part of it they believed to be false. See *Frazier* v. *State*, 56 Ark. 226; *Taylor* v. *State*, 82 Ark. 540, and *Bruder* v. *State*, 110 Ark. 402.

(3-4) Counsel for the defendant also assigns as error the action of the court in refusing to give seven other instructions asked by him. We do not deem it necessary to set out these instructions, for they are fully covered by the instructions given by the court, and it is well settled that the court is not required to multiply or repeat instructions on the same point. The court gave sixteen instructions to the jury. These instructions cover every possible phase of homicide, and the jury also were fully instructed on the question of reasonable doubt and the presumption of innocence that attended defendant throughout the trial. The instructions given covered every possible question of fact that might arise in the case. We have not set them out and we do not deem it necessary to do so. No objections were made to them in the court below, and even in capital cases there can be no reversal of judgment for an erroneous instruction which was not objected to in the court below. *Alexander* v. *State*, 103 Ark. 505.

We have carefully examined the record and find no prejudicial errors in it. Therefore, the judgment must be affirmed.