SMITH *v.* STATE.

4583                                        223 S. W. 2d 1011

Opinion delivered October 31, 1949.

Rehearing denied November 21, 1949.

2

*Max Howell,* for appellant.

*Ike Murry,* Attorney General, and *Jeff Duty,* Assistant Attorney General, for appellee.

MINOR W. MILLWEE, Justice.   Appellant was charged with murder in the first degree for the killing of Mrs. Sallie Mae Barner.  The jury found him guilty and fixed his punishment at death and this appeal is prosecuted to reverse the judgment rendered in accordance with the jury's verdict.

The facts as disclosed by testimony offered by the State are substantially as follows: Sallie Mae Barner was employed as a nurse at the University Hospital in the City of Little Rock.  On the morning of May 4, 1949, Mrs. Barner was on her way to work and had reached a point near the hospital between 10th and 11th Streets on McAlmont Street, when she was shot and killed.  A man was seen running from the scene of the killing.  Police who arrived soon after the shooting found five expended pistol shells around the body of deceased.  A .38 caliber automatic pistol with three unexpended shells in a maga-

zine clip was found in a yard at 1011 McAlmont Street. The finding of a man's jacket containing pictures of the deceased, and other papers, in the alley between 9th and 10th Streets led to a search for appellant who was apprehended by a police officer at Jacksonville, Arkansas, on the morning of May 5, 1949.

Appellant was brought to Little Rock where he freely admitted the killing to Chief of Detectives, C. O. Fink, and consented to the making of a full statement to the prosecuting attorney. After being advised that he did not have to make a statement and that if he did so it could be used against him, and after being sworn by the prosecuting attorney, appellant's statement in question and answer form was taken down by the grand jury reporter and introduced at the trial. According to this statement, appellant and deceased were married in Texas in July, 1946. Appellant had been previously married, but was under the impression that a divorce had been procured by his first wife. When deceased learned that appellant had not been divorced from his first wife, she obtained an annulment of her marriage to appellant. The annulment was obtained in March, 1947, and Texas enforcement officers were informed of the bigamous marriage. Appellant was charged with bigamy in Cass county, Texas. He entered his plea of guilty to the charge and was sentenced to three years in the Texas Penitentiary. He was released from the penitentiary in March, 1949, and came to Little Rock on April 29, 1949.

Appellant learned that Mrs. Barner was working at the hospital and after talking with her on the telephone met her at Second and Main Streets in North Little Rock. He asked her for his social security card, some rings, and $500 which he stated he had left with her for safekeeping until his release from the penitentiary. She stated that she did not have the things, but would get them and asked him to come back later. A few days later appellant went to Mrs. Barner's residence in North Little Rock, but learned that she had moved. Being unable to locate her new place of residence, appellant went to 1011

McAlmont Street on the morning of May 4, 1949, and waited for Mrs. Barner to come to work at the hospital.

In his confession, appellant first stated that he had stolen the pistol which he took to the scene of the killing, but later said that a young lady with whom he was keeping company had procured the pistol for him after he had lied to her about needing it for protection. The confession continues: ''Q. Now, what did you want with the gun? A. I wanted it to scare her to try to get my money and stuff from her if it was necessary. Q. You got the gun to scare Mrs. Barner to the point of getting your money if it was necessary? A. Yes, sir. Q. When did you decide to kill her? A. Not until I was talking to her. Q. While you were talking to her you decided to kill her? A. Yes, sir. We was standing there talking and arguing and she said she had my social security cards over at the hospital there on the second floor where she was working, and the rings and other little keepsakes and things, well, I don't know where she had them. I told her, I said, 'Sallie Mae, I have got to have some money. I gave it to you to keep so I could get established when I got out of the penitentiary' and she said she didn't have any money and she said, 'I am not going to get any' and naturally we got in an argument and before I knew it it had happened. When she started off she said, 'I am going to call the law on you' so I stopped her. Q. You say you stopped her? A. I called her and she stopped. She stepped off in the edge of the street and I told her, 'Sallie Mae, I want my money and things' and she said, 'I am not going to give them to you. I am going to call the law' and we had already had some hot words and it just happened. Q. When she started off didn't you grab her arm? A. She was on the side of me and when she started around me I put my hand out to stop her and I said, 'Wait a minute. We are not through talking' and she stepped on off in the street and she said, 'I am not going to give you anything' and she said, 'I am going on to the hospital and call the law' and I just went haywire and did it, and shot her. Q. How many times did you shoot her? A. Really, sir, I don't know. Q. When did you pull

the gun out? A. I showed it to her while we were on the sidewalk. Q. You showed it to her while you were talking? A. Yes, sir. Q. Then you had it in your hand? A. No, sir. Q. Where was it? A. In there (indicating). Q. Under your shirt or under your jacket? A. Under my jacket. Q. Stuck in your belt? A. Yes, sir. Q. And when she started on you pulled it out and shot her in the back? A. Yes, sir. I just went haywire.''

Appellant further stated that after the shooting he threw the gun in the yard and went down an alley to the next street and down a side street to another alley where he removed and left his jacket. He proceeded from there across a railroad bridge to the Missouri Pacific railway yards in North Little Rock where he caught a train which he thought was leaving town. When he discovered the train was not going out of town, he walked up the tracks within three or four miles of Jacksonville and ''slept out'' that night. He came into Jacksonville the next morning and procured a newspaper from which he learned that the police were looking for him. After drinking some beer, he telephoned Chief Fink that he was ready to surrender and the call became disconnected. Shortly thereafter Officer Garner appeared and took him into custody. Appellant also admitted that on the morning of the killing he stopped a man about four or five blocks from the University Hospital and inquired as to its location, and that he was standing on the corner near the hospital and asked a lady across the street if that was the University Hospital. He also stated that he thought Mrs. Barner was in Arkansas when he entered his plea of guilty to bigamy, and that she did not appear against him, but had told him that she had informed the authorities and he felt that she was responsible for his going to the penitentiary.

The State introduced in evidence a photograph of the nude back of deceased taken at a funeral home shortly after the killing showing the points of entry of five bullets in the left arm and back of deceased. The coroner who was called to the scene soon after the shooting described the fatal bullet wounds and pointed out

on the back of the prosecuting attorney the points of entry of the bullets.

A letter from appellant to Jack Barnard and wife of Little Rock, who had known appellant for seven or eight years, was properly identified and introduced in evidence by the State. The letter was dated March 20, 1949, from Corsicana, Texas. In this letter appellant professed his love for, and intention to marry, Barnard's sister-in-law and, in reference to deceased, stated: ''If that dam dirty Sallie Mae sent or brought my things over I hope you will keep them there for me. She was scared to death when I contacted her. I've had my revenge on her for she will always be afraid I may harm, hurt or murder her to keep her in suspense and knowing her conscience hurts her is payment to me. I wouldn't have her on a platter of diamonds & gold.''

Mrs. J. M. Bizzell, mother of deceased, who lives near Austin, Lonoke County, Arkansas, testified that she was acquainted with appellant's handwriting and identified letters that he had written to her and her daughter. She identified a letter written by appellant to deceased from Bryan, Texas, on January 15, 1947. The letter reads: ''Dearest Sallie Mae: Hope you are well and are really happy. I want you to live high for it won't last long. Why? I've written and written you—no answer. I love you above life itself. I'm coming up there. I won't say when or how soon. But the little (25) I have of yours— *I'm going to use it. Yes, use it* on you then turn it on my-self. So help me 'God' I am. If I can't have you no other on earth will. I'll be seeing you. Your husband & Little boy, R. L. Smith.''

A letter from appellant to Mrs. Bizzell dated April 8, 1949, from Marshall, Texas, was introduced in which appellant informed Mrs. Bizzell that he would be at her home on April 12th or 13th and warned her to have Mrs. Barner there and stated that if she was not there, ''I'll see her wherever she is. I'm not fooling. I mean to see her and get what belongs to me.'' Mrs. Bizzell also found two notes addressed to her in appellant's handwriting together with a picture of deceased on the front porch of

her home on the morning of April 14, 1949. The notes were dated April 13, 1949. The first note reads in part: "When you wake up and find this I hope I have Sallie— will if she is in Little Rock. If so she wont ever come home again. Dam her rotten soul. Yes you know who I am. Caused me to serve 3 yrs. and she Sallie will pay for it too. I hate you all."

The second note is in part as follows: "No writing paper so wrote on this where I'd parked my car and brought it back—yes—I've a new Buick and money to ruin Sallie Mae. I'll be made happy to see her ruined too dam her . . . I'll find her before Sunday too wait and see—Ha, Ha, Old woman."

On the front of the picture of deceased left on Mrs. Bizzell's porch the following appears in appellant's handwriting: "Whore, whore, whore. I'll get even with you if I die for it. I hate your very guts," and on the back of the picture: "Here's your prostitute daughter's picture. I'll have her before Sunday 17th. I'm paying $500 in Little Rock to find her."

Mrs. Bizzell further testified that a few days before her daughter was killed the latter requested that witness send her a belt, purse, social security card, Bible and handkerchief belonging to appellant and that she did so.

Appellant offered no testimony.

The first three assignments of error challenge the sufficiency of the evidence to support the verdict. It is argued that the confession of appellant furnished the only evidence as to Mrs. Barner's death and conclusively shows that appellant acted without malice and deliberation in the killing which only amounted to voluntary manslaughter. Without commenting on the testimony as detailed above, we hold that it was sufficient, when considered as a whole and in the light most favorable to the State, to show a malicious, deliberate and premeditated killing, and that it fully warranted the jury in returning a verdict of murder in the first degree.

It is next contended that the court erred in permitting the introduction of the photograph of the nude back

of deceased taken shortly after the killing. It was stipulated that the photograph had been accurately taken and correctly portrayed the number and location of the wounds on deceased's back. But it is argued that the photograph did not shed any light as to appellant's guilt or innocence and is so gruesome as to inflame and prejudice the minds of the jury against the appellant. Upon the admission of the photograph in evidence the court admonished the jury as follows: "It is the duty of the Court to admonish this jury, however, that you are not to allow your feelings to be wrought up over observing this photograph. It is not introduced in evidence for the purpose of inflaming the minds of the jury against the defendant—that has no part in the case. It is merely introduced as a fact so you may see the area, extent and location of the wounds and that is all. The Court admonishes you very definitely not to let your minds become inflamed by this picture."

The admission in evidence of photographs of victims of murder has been sanctioned by this court and by courts of other jurisdictions in numerous cases. The general rule is stated in Vol. 2, Wharton's Criminal Evidence (11th Ed.), p. 1320-1, as follows: "Admissibility of photographs does not depend upon whether the objects they portray could be described in words, but rather on whether it would be useful to enable the witness better to describe, and the jury better to understand, the testimony concerned. Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Competent and material evidence should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible."

In the case of *Nicholas* v. *State,* 182 Ark. 309, 31 S. W. 2d 527, cited by the author in support of the above rule, this court said: "Appellant's next assignment of error is that the prosecuting attorney was allowed to introduce as an exhibit to the jury a picture of the deceased taken immediately after his death, and before his removal from the scene of the tragedy. It is argued that,

because this picture showed the awful gunshot wound in all its gruesomeness inflicted upon the deceased by appellant, it tended to arouse the passions of the jury, and thereby prevent a fair and impartial trial. The picture was nothing more than a description of the fatal wounds received by deceased at the hands of appellant. The character of the wound inflicted upon deceased by one charged with his murder is always admissible in evidence, and we know of no rule limiting the description thereof to word of mouth. No authority is cited by appellant in support of his contention that the character of the wound may not be shown by a genuine photograph. We do not think the most accurate method of reflecting a truth should be eliminated, but, just to the contrary, such a method should be approved and accepted.'' See, also, *Simmons* v. *State*, 184 Ark. 373, 42 S. W. 2d 549; *Higdon* v. *State*, 213 Ark. 881, 213 S. W. 2d 621; *Black* v. *State*, 215 Ark. 618, 222 S. W. 2d 816.

Appellant relies on the case of *Garrett* v. *State*, 171 Ark. 297, 284 S. W. 734. In that case the court observed there was no necessity for the introduction of the photograph, since there was nothing about the location of the wounds which the photographs tended to elucidate. It was further held that there was nothing about the photograph of a nature so gruesome as to inflame the passions of the jury and that this was demonstrated by the fact that the defendant was only convicted of the lowest degree of homicide.

The admission and relevancy of photographs must necessarily rest largely in the discretion of the trial judge. *Higdon* v. *State, supra*. It cannot be denied that the photograph in the instant case represents clearer and more understandable evidence than oral testimony. The fact that it was cumulative to the coroner's testimony does not affect its materiality. *State* v. *Nelson*, 162 Ore. 430, 92 Pac. 2d 182. An examination of the photograph discloses nothing of a particularly gruesome character. It shows the back, left arm and back of the head of deceased. The face is not shown and there is no blood or mutilation of the body except the five scattered bullet

marks inflicted by appellant. We find no abuse of discretion in the admission of the photograph.

Appellant made a general objection to the admission of the confession. The trial court followed the approved practice of retiring to chambers to determine admissibility. Appellant offered no evidence to refute proof by the State showing that the confession was voluntarily made without force, threats, or promises of reward or leniency. While appellant was not advised that he was entitled to counsel, it was shown that he made no request for counsel. It is insisted that the failure to notify appellant of his right to counsel rendered his confession inadmissible. We held to the contrary in the recent case of *Thomas* v. *State,* 210 Ark. 398, 196 S. W. 2d 486, where we adopted the general rule to the effect that a confession is not inadmissible merely because accused was not informed that he was entitled to consult counsel.

It is next insisted that the court erred in permitting the introduction of the several letters and notes written by appellant and the picture of deceased that was left on Mrs. Bizzell's porch with the two notes. The trial court correctly ruled that the letters and picture were admissible for the purpose offered by the State, namely, to show malice and premeditation on the part of appellant. *Bolling* v. *State,* 54 Ark. 588, 16 S. W. 658; *McElroy* v. *State,* 100 Ark. 301, 140 S. W. 8; 23 C. J. S., Criminal Law, § 850, p. 42.

Appellant also insists that the letters and picture were inadmissible because they were calculated to impeach the confession. It seems to be well settled by our cases and those from other jurisdictions that, while the accused is entitled to have his entire statement admitted in evidence, including any self-serving or exculpatory declaration, it is for the jury to say what weight should be given to the several parts of the statement and they may believe that part which charges the accused and reject that part which tends to exculpate him. It is within the jury's province to accept such portions of the testimony in the whole case, including the confession, as they believe to be true and disregard that which they

believe false. *Frazier* v. *State,* 42 Ark. 70; *Brewer* v. *State,* 72 Ark. 145, 78 S. W. 773; *McLemore* v. *State,* 111 Ark. 457, 164 S. W. 119; *King* v. *State,* 117 Ark. 82, 173 S. W. 852.

It is also contended that the court erred in refusing to give appellant's Requested Instructions Nos. 1, 2, 3, 4, and 5. Requested Instructions 1, 3 and 4 deal with manslaughter, presumption of innocence and reasonable doubt, and were fully covered by the instructions given.

Defendant's Requested Instructions Nos. 2 and 5 are as follows: No. 2. "You are instructed that if you find that the defendant was provoked to commit the assault on the deceased which he did commit by a passion consisting either of anger or fear to such an extent that he was unable to resist or to refrain from the committing of such assault, then he would be guilty of one of the degrees of manslaughter which has just been defined to you, and he would not be guilty of murder in the first degree." No. 5. "You are instructed that if you find that at the time the defendant committed the assault as alleged in the information he had become so wrought up or that his mind was in such condition that he temporarily was not capable of knowing and realizing right from wrong nor what would be the nature and probable consequences of the acts performed by him, then he would not be legally responsible for such assault and your verdict would be for the defendant. This is true even though you might find that the defendant is not at this time insane or that he was not insane prior to the assault committed."

The trial judge did not instruct the jury on involuntary manslaughter nor was he requested to do so. Appellant did not interpose the plea of insanity. But if he had done so, the instructions as requested did not correctly state the law. In the leading case of *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186, the court said: "Where one is on trial for murder in the first degree and the State proves the killing under circumstances that would constitute murder in the first degree if the homicide was committed by a sane person, then if the killing is admit-

ted and insanity is interposed as a defense such defense cannot avail unless it appears from a preponderance of the evidence, *first,* that at the time of the killing the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing; or, *second,* if he did know it, that he did not know that he was doing what was wrong; or, *third,* if he knew the nature and quality of the act, and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease, to resist the doing of the wrong act which was the result solely of his mental disease. . . .

"But it must be remembered that one who is otherwise sane will not be excused from a crime he has committed while his reason is temporarily dethroned not by disease, but by anger, jealousy or other passion; nor will he be excused because he has become so morally depraved 'that his conscience ceases to control or influence his actions.' In other words, neither so-called 'emotional' nor 'moral' insanity will justify or excuse a crime."

In *Korsak* v. *State,* 202 Ark. 921, 154 S. W. 2d 348, it was held that one may be excused as an insane person only when his mind has become diseased and because of such disease he has lost power to distinguish between right and wrong. It was there said: "But if one's conduct was not induced by this mental condition, but from the excitation of the lower passions, whether of hate, prejudice, desire for revenge, or lascivious desire, he is responsible for his act. Frenzy is not insanity."

While there was little in the evidence to show that the killing was "upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible," the trial court instructed the jury on voluntary manslaughter in the language of the statute (Ark. Stats., 1947, §§ 41-2207 and 41-2208). Moreover, a person cannot take advantage of a provocation invited and brought about by his own unlawful aggression, in order to reduce the grade of his crime from murder to manslaughter, when he has not in good faith attempted

to retire from the encounter. *Noble* v. *State,* 75 Ark. 246, 87 S. W. 120. Instruction No. 2, requested by appellant, entirely ignored the idea of malice and permitted the jury to reduce the crime to manslaughter even though they found that appellant brought on the difficulty maliciously and with the specific intent to kill. As this court, said in *Price* v. *State,* 114 Ark. 398, 170 S. W. 235: "The omission is an important one, for if defendant sought the difficulty with malice against the deceased and assaulted the latter, or used opprobious epithets toward him for the purpose of bringing on the difficulty, he cannot claim the benefit of a sudden passion aroused by an assault made by the deceased in consequence of the appellant's own conduct." We find no error in the court's refusal to give the requested instructions.

Complaint is also made relative to the verbiage of the court's instruction on the form of the verdict in the event of a conviction on the charge of murder in the first degree. It is sufficient to say that no objection was made to the instruction in the trial court, and it cannot now be urged in this court. *McKenzie* v. *State,* 26 Ark. 334; *Alexander* v. *State,* 103 Ark. 505, 147 S. W. 477; *Johnson* v. *State,* 127 Ark. 516, 192 S. W. 895.

After argument of counsel the court stated that he had neglected to instruct the jury relative to malice and the confession introduced by the State and gave additional instructions covering these issues. After his objection that the additional instructions were given out of time, counsel for appellant accepted the court's invitation to further argue to the jury the issues raised by the additional instructions. The additional instructions correctly stated the law and the giving of them did not, under the circumstances, constitute reversible error. *Manasco* v. *State,* 104 Ark. 397, 148 S. W. 1025.

Upon the whole case we find no prejudicial error, and the judgment is affirmed.