Richard Neal WILLIAMS v. STATE of Arkansas

5556                                     467 S. W. 2d 740

Opinion delivered June 7, 1971

860

*H. Allan Dishongh* and *James L. Sloan,* for appellant.

*Ray Thornton,* Attorney General; *Milton Lueken,* Asst. Atty. Gen., for appellee.

J. Fred Jones, Justice. Richard Neal Williams was convicted of first degree murder in the Hempstead County Circuit Court and sentenced to life in the Arkansas Penitentiary. On appeal to this court he relies on the following points for reversal:

"I.    The circuit court abused its discretion in admitting State's Exhibit 33 insofar as it consisted of a collection of contraceptive rubbers.

II. The circuit court erred in receiving in evidence State's Exhibit 36, the bloody panties of Carolyn Cassidy.

III. There was no legitimate ground for letting in State's Exhibit 39, a letter of 'Jeannie Day.'

IV. Under the circumstances the Black Orchid Club card was more prejudicial than relevant.

V. State's Exhibit 3 and 4, the photographs of the corpses, were gruesome, morbid, and shocking in the extreme, but barely relevant if at all. They should have been excluded.

VI. It was the duty of the circuit court to instruct the jury as to the limited purposes for which the evidence of other crimes could be considered.

VII. A manslaughter instruction should have been given.

VIII. Severe prejudice resulted from the circuit court's omission of an instruction on the effect of drunkenness."

The revolting facts of this case are not greatly in dispute except as to details; and as to whether the 15 year old defendant, Williams, or his 12 year old female companion, Carolyn Cassidy, fired the shots that killed her mother, Lou Dean Cassidy, and her mother's companion and paramour, Paul Parsons.

On Monday morning, March 30, 1970, the bodies of Parsons and Mrs. Cassidy were found within about four feet of each other beside a dirt and gravel road near Nashville in Hempstead County. Parsons had been shot through the right eye and Mrs. Cassidy had been shot through the left eye. Both bodies appeared to have been dragged feet first a short distance from some automobile tracks in the road to where the bodies were found. About

the same time the bodies were discovered, Williams was apprehended while driving Parsons' automobile near Mt. Pleasant, Texas.

The undisputed background facts as gleaned from the testimony of Carolyn as well as that of Williams, appear as follows: Parsons was 40 years of age (according to his driver's license) and Williams was 15 years of age and they both lived at Delight, Arkansas. Williams knew and liked Parsons, but had been warned by his mother against associating with him. On Sunday evening, March 29, 1970, Williams had planned to go fox hunting with some young friends but the plans miscarried and he came upon Parsons parked in his automobile at his favorite parking place on a street in Delight. In the course of conversation Parsons told Williams that he had a .22 caliber pistol that had been misfiring and Williams suggested that he might be able to fix it. They drove to Parsons' home where they obtained the pistol, then drove to a lumber company building where Williams fired the pistol several times and where they drank some wine furnished by Parsons. After driving around and drinking some beer, Parsons suggested that they drive to Nashville where he knew a woman he could have a date with and Williams agreed to go along. Upon arrival at Nashville, they drove to the Cassidy home where Lou Dean Cassidy got into the automobile with them. They drove around Nashville for a short period of time and then returned to the Cassidy home where they picked up Mrs. Cassidy's 12 year old daughter, Carolyn Susan Cassidy.

Parsons had placed the pistol under the front seat of the automobile and after Mrs. Cassidy and her daughter got into the automobile, they drove to a drive-in cafe where they purchased some cokes; and with Williams and Carolyn in the rear seat, and with Mrs. Cassidy beside him in the front seat, Parsons drove out into the country about 9:30 P.M. and parked the automobile on a dirt and gravel road. Parsons obtained a bottle of whisky from the trunk of the automobile and he and Mrs. Cassidy and Williams drank some whisky mixed

with cokes. Parsons and Mrs. Cassidy then got into the rear seat of the automobile and Williams and Carolyn got into the front seat. Parsons and Mrs. Cassidy had sexual relations in the back seat but Carolyn refused to have sexual relations with Williams in the front seat. From this point on Carolyn and Williams differ in their versions of the events that transpired.

Carolyn testified that after her repeated refusals to have sexual relations with Williams, her mother as well as Parsons told Williams to leave her alone. She says Williams started crying and talking about a girl who had refused to marry him. She says that he got out of the automobile, fell to the ground, and complained that something was wrong with his legs and that he could not walk. She says that she got into the back seat of the automobile and her mother and Parsons picked Williams up from the ground and laid him on the front seat of the automobile. She says that her mother then put a handkerchief in Williams' mouth to keep him from biting his tongue. She says that she was sitting on the left side of the back seat next to her mother, who was then sitting next to Parsons and partially on his lap. She admits that she was turning the dome light on in the car and that Parsons was insisting that she leave it off. She says that after Williams had lain on the front seat for about 20 minutes, he sat up, pulled her toward him, and demanded that she get back into the front seat with him. She says that when she refused, Williams showed her a pistol which he held in his hand and told her that if she did not get into the front seat with him he would kill her and her mother. She says that she told her mother what Williams had said but that her mother didn't believe her. She says that her mother suggested to Williams that he turn the car radio on and that after attempting to do so, Williams told Parsons that the radio was broken and he should get it fixed. She says that Parsons answered that he would get it fixed the following day and that Williams told him he would not live long enough to get it fixed. She says Williams then shot Parsons in the face with the pistol; that Parsons fell over on her mother and that Williams then turned the pistol

on her mother. She says that her mother said "please don't shoot me," but that Williams shot her mother. She says that Williams then demanded that she get into the front seat with him and that she did so. She says that when she moved from her position in the back seat, her mother fell over toward the left door. She says that Williams then removed all her clothing, except her brassiere, and that he jerked it from her body and that he then raped her. She says that after Williams raped her, he forced her to commit an act of sodomy and then ordered her to get dressed. She says that she put her clothes back on, except the brassiere which she threw out of the car, and that after Williams got dressed, he first dragged Parsons' body out of the car by the legs and then dragged her mother's body from the car in like manner. She says that Williams then removed articles, including her mother's panties and shoes, from the car and threw them near the bodies; that he then cut the bloody seat covers from the rear seat of the automobile with his pocket knife and threw the seat covers and a bloody floor mat on the ground near the bodies. She testified that Williams then drove the car forward and turned it around; that he then drove back slowly past the bodies to the main highway and then drove south toward Texarkana. She says that Williams ordered her to take everything out of the glove compartment and examine for Parsons' name. She says he made her throw Parsons' wallet out of the car but that Williams altered Parsons' driver's license and kept it. She says that Williams did not drive through Texarkana but after driving around Texarkana, he stopped near a lake where he fired the pistol out of the automobile window to show her it would still shoot, and that after raping her again he drove on toward Redwater, Texas. She says that they stopped for gas and that Williams left without paying for the gas after telling the attendant that he had been in a fight in order to explain the blood in the car. She says that when they reached Maud, Texas, Williams told her he did not want her with him in the event he should be stopped by police; that he gave her 15 cents with which to place a collect phone call to her uncle in Mineral Springs, Arkansas, and that after admonishing her to say she didn't know anything if ques-

tioned by the police, he then let her out of the automobile. She testified that she went to a nearby washateria where she reported what had happened; called her uncle collect and was soon picked up by police officers.

Officer David Ward, who apprehended Williams in Mt. Pleasant, Texas, testified that he was in Mt. Pleasant when he received a radio call describing an automobile which had left a filling station without paying for gas; that he was parked on the side of the highway waiting for the automobile when it arrived at about 80 miles an hour. He testified that he pursued the automobile and it failed to slow down or stop when he turned his red lights on. He says that he then turned on his siren and the automobile stopped at one of the turn-throughs at a highway intersection. He says that as he approached the automobile, the door opened and he saw a pistol in the armrest inside the door and that he took possession of it. He testified that Williams was driving the automobile and that before he had said anything to him, Williams said, "My God man, help me, I've just murdered two people." He says that Williams then told him that he had been with a girl and that she had forced him to shoot two people.

Mr. George Oosterhous, special agent for the FBI, testified that he interviewed Williams at the office of the chief of police in Mt. Pleasant, Texas, about 1:30 p.m. on March 30. His testimony was to the effect that Williams related to him that Carolyn took a gun from under the front seat of the automobile and shot Parsons outside the car and then shot her mother; that she forced him to drag Mrs. Cassidy's body from the car and then told him to leave the area; that she stated she would kill him if he tried to escape and that they drove for several hours while Carolyn was holding a gun on him. He says that Williams told him that at some time about midnight, Carolyn forced him to stop and have sexual relations with her; and that Williams stated that after this happened he was completely exhausted and went to sleep; that when he awoke it was nearly morning; that he did not know where he was but that he continued driving; that Carolyn told him to pull into a filling station and

have the tank filled and then speed away which he did; that they continued to drive for about one-half hour when he finally talked Carolyn into letting him go, and that she asked to be let out at Maud, Texas. He says that Williams told him that after Carolyn let him go, he began searching for a law officer so that he could report what had happened during that long evening, and that he was finally able to find an officer at the Mt. Pleasant Police Station. He says that Williams told him that as they left Nashville, Carolyn made some excuse to go back into the house and that she brought out a pistol and put it under the front seat of Parsons' automobile.

Mr. Sam Johnson testified that on March 30 about 6:00 a.m. he started to a nearby hay field and found the two bodies at the side of a gravel road at a place called Propps Creek; that after determining that the bodies were dead, he immediately called the sheriff.

Captain Milton Mosier, of the Arkansas State Police, testified that he arrived at the scene of the crime about 7:20 a.m. on March 30. He says that the two bodies were lying on the righthand side of the road partially in the ditch. He says that the bodies were lying side by side about four feet apart with their arms outstretched above their heads and with their heads and hands partially in the road and with their feet resting in the ditch and on the shoulder of the road. He testified that Parsons' shirt was unbuttoned and that he had on a T-shirt under his other shirt. He says that Parsons had mud on the T-shirt and under his belt; that Parsons had his socks on and that one shoe was on and one off. He says that Parsons' arms were over his head and his legs were pretty straight out. He testified that marks on the road indicated that Parsons' body had been dragged to where it was lying. He testified that Mrs. Cassidy's dress was bloody and up around her waist; that there was a brassier on the body and that another brassiere was found at the scene. He testified that a pair of lady's panties were found hanging on some briers near the bodies; that Mrs. Cassidy's body was lying on its back

with the feet outstretched and that the body was naked from the waist down. He says that Mrs. Cassidy's shoes were off and lying beside her body; that there was a pocket of blood under her left eye and that there was blood on her face and dress. He testified that the body had been dragged to where it was lying.

On cross-examination this witness testified that Parsons' body was lying flat on its back with his face up and that Mrs. Cassidy's body was lying about four feet from Parsons' body with her face turned toward her left. He says that a ridge of dirt had washed down the hill filling the ditch where the bodies were found, and that the bodies had been dragged through the ridge of dirt. He testified that there was at least an inch of dirt wedged under Parsons' belt. He says that the ground where the bodies were found was damp and that Parsons' shirt was pulled out and up around his waist. He says the shirt was clean up under the arms but there was mud on the shirt up between the shoulders. He says there was mud on the left hip and side of Mrs. Cassidy but that her shoes were free of mud. He testified there was no indication of movement of the bodies while they were on the ground.

Dr. Rodney Carlton, state medical examiner, testified that Parsons was shot through the right eye and the brain, and that Mrs. Cassidy was shot through the left eye and the brain. He removed the bullets later identified as having been fired from Parsons' gun.

Sergeant Carroll Page of the Arkansas State Police testified that he interviewed Williams at Mt. Pleasant, Texas, and that Williams told him practically the same story as testified to by the other officers. He testified that he examined the automobile and that there was a lot of blood under the cushion in the righthand corner and in the center of the back seat.

Williams testified in his own defense and his version of what took place at the scene of the crime and subsequent thereto, differs considerably from Carolyn's version. Williams readily admitted that he tried to per-

suade Carolyn into sexual relations with him while her mother and Parsons were so engaged in the rear seat of the automobile, but he says he gave up when she refused. He denied that anyone told him to leave Carolyn alone and he denied that he fell outside the automobile and that Parsons and Mrs. Cassidy placed him in the front seat. He denied that he had sexual relations with Carolyn at all, and he denied giving the police any different version than that to which he testified. Williams testified that Carolyn kept turning the dome light on in the automobile and that Parsons told her in a rough manner to turn it off and leave it turned off. He says that Parsons then stepped out of the automobile "to use the bathroom" and that Carolyn stepped out of the automobile also. He says he heard a gunshot and that Carolyn then pointed the gun into the car at her mother. He says that Mrs. Cassidy exclaimed, "What are you doing with that gun! Give it to me," and as she reached toward the gun, Carolyn shot her mother. He says that Carolyn then ordered him to drag Mrs. Cassidy's body from the automobile and that he did so by holding her under the arms. He says that he laid the body beside the road and that Carolyn then handed him his own knife and ordered him to remove the bloody seat covers from the car which he did. He says that she then ordered him at gunpoint to drive toward Texas. He says that sometime in the morning hours he became completely exhausted and pulled the automobile over to the side of the road and stopped. He says that when he stopped Carolyn said, "come here" and as he scooted over toward her, he passed out and didn't awake until 5 o'clock in the morning. He says that as soon as he awoke, Carolyn said "Let's go." He says that when they stopped for gas Carolyn ordered him to leave without paying for it. He says that she released and left him at Maud, Texas, and told him not to try contacting the police. He testified that prior to his release he had been driving about 80 miles per hour hoping that he would be stopped by police for speeding, and that after Carolyn left him at Maud, Texas, he continued driving at about 75 or 80 miles per hour in search of a police officer or a house where he could report what had happened. He testified that as he was entering Mt. Pleasant, Texas, he saw a

police car and was slowing down to stop when the police car overtook him. He says that he said to the police officer, "My God, man, help me. I think I just helped kill two people." He testified that he was quite sure Mrs. Cassidy was dead when he removed her body from the automobile, but that he thought Parsons might still be alive. According to Williams' version, he was anxious to tell his story to the police officers so they could catch the girl.

Williams is represented on this appeal by different attorneys from the one who represented him at the trial. On oral argument they contend that under Act 333 of 1971 we are required to search the record for any error by the trial court, whether called to the trial court's attention by objections made and saved or not; and that we should only concern ourselves with whether Williams received a fair and impartial trial. Act 333 is entitled: "AN ACT to Simplify the Procedure for Appeals From the Circuit Courts to the Supreme Court of Arkansas in Criminal Cases; and for Other Purposes." Section 11 of the Act is the one most emphasized in oral argument and is as follows:

> "*Matters to be Considered on Appeal.* The Supreme Court need only review those matters briefed and argued by the appellant provided that where either a sentence for life imprisonment or death, the Supreme Court shall review all errors prejudicial to the rights of the appellant."

Act 333 became effective on March 22, 1971, approximately nine months after Williams was tried, but Williams' attorneys argue that § 11 of the Act is procedural as applied to cases on appeal to this court and is retroactive to cases tried prior to the effective date of the Act. We do not pass on the application of Act 333 to the case at bar, for the reason that due to Williams' tender age; and due to the absence of evidence of prior offenses or criminal tendencies, we have examined the record without regard to exceptions, and we find no reversible error therein.

The purpose of a criminal trial is to determine the guilt or innocence of the accused, and the primary function of a jury is to determine whether the accused did or did not commit the crime with which he is accused. A jury panel is composed of adult citizens and a fair and impartial jury is selected in a given case by the process of elimination through peremptory challenges and challenges for cause. A jury is charged with the responsibility and sworn duty to acquit an accused if found innocent, and to convict and fix punishment within the bounds of the law when the accused is found guilty. The burden rests on the state to prove the accused guilty beyond a reasonable doubt. As a practical matter, when the accused is found guilty, a jury may, and does, consider mitigating circumstances in assessing the penalty within the range fixed by law for the offense.

Under the evidence in the case at bar the jury had to choose between Carolyn's version and Williams' version of what occurred at the scene of the crime. The jury apparently believed Carolyn's version rather than Williams' and returned a verdict of guilty of murder in the first degree. There is no indication in the record before us that the jury's task in reaching its verdict, was not as unpleasant as is our own in affirming it.

We have not attempted to retry this case under the different trial strategies the separate members of this court might have adopted had we been representing Williams; consequently, we have not examined the record for every possible objection that might have been made to the evidence that was submitted at the trial; and we have not attempted to weigh the effects such possible objections might have had on the verdict of the jury if they had been made and sustained or overruled. We have, however, concerned ourselves with whether Williams received a fair trial and we are of the opinion that he did.

It was the state's theory that Williams killed Parsons and Mrs. Cassidy in order to force sexual relations on Carolyn without interference from her mother or Par-

sons. We now proceed to the errors assigned by Williams in the points he relies on and in the order they are presented.

As to Williams' first point, Carolyn testified that the second time Williams raped her, he first attempted to use a contraceptive rubber. The contraceptives introduced into evidence were admittedly taken by the officers from the glove compartment of Parsons' automobile. There is no evidence that Carolyn knew they were in the automobile and the state had a right to introduce the exhibits in support of the credibility of Carolyn's testimony that Williams twice raped her and in doing so, attempted to use a contraceptive device the second time. In *Glover* v. *State,* 194 Ark. 66, 105 S. W. 2d 82, we said:

> "It is an accepted rule that a relevant fact will not be rejected because not sufficient in itself to establish the whole or any definite portion of a party's connection, 'but all that is required is that the fact must legitimately tend to prove some matter in issue, or to make a proposition in issue more or less probable. Indeed, it is sufficient if the fact may be expected to become relevant in connection with other facts, or if it forms a link in the chain of evidence necessary to support a party's contention, although requiring other evidence to supplement it.' 22 C. J. § 91, p. 164."

Williams testified that the contraceptives belonged to Parsons and he denied that he attempted to use one. We find no prejudicial error in their acceptance in evidence.

The same rule applies to Williams' second point. Carolyn testified that she got no blood on her clothing from her mother or Parsons. She testified that she was only 12 years of age; that she was raped twice, and that she had never experienced sexual intercourse before. Again this exhibit supported the credibility of Carolyn's testimony that Williams raped her and in fact, supported

the credibility of her testimony to the effect that Williams' sexual lust was his motive for the crime of murder. The state had the right to offer the exhibit and Williams had a right to deny knowledge of the blood on Carolyn's undergarment, or he had a right to attempt to explain it; he did both. He testified that he did not know how the blood got on the garment but that Carolyn could have been menstruating. Williams' attorneys vigorously point out that no objections were made to the introduction of this exhibit, but we hold that the exhibit was admissible; therefore, if an objection had been made it should have been overruled.

Williams' third point has to do with a vulgarly worded letter addressed to no one but simply beginning with the salutation "Hi." This letter was picked up with other articles at the scene of the crime. The front of the one page letter complains that when the sender attempted to call, the intended recipient was always in Nashville cutting up cars. The front of the page concludes as follows: "By-by. P. S. Tell Wayne I said Hi. Carolyn said Hi! too." Some vulgar language is written on the back of the page and is signed, "Love, Jeannie Day." This letter was among other items apparently thrown out of the automobile at the scene of the crime, and it was not connected in any manner with Williams. There is no evidence that the letter was read to or by the jury, and if its contents could have reflected on the character of anyone involved, it could only have reflected on the character of the prosecuting witness, Carolyn Cassidy, by association; assuming of course that she was the Carolyn referred to in the letter. There was no evidence that Williams was ever engaged in "cutting up cars" in Nashville or any where else. Both Carolyn and Williams testified that they were not acquainted with each other prior to the date of the homicides and if the acceptance of the letter in evidence was error, it was harmless error.

We are of the same opinion concerning the appellant's fourth point. The Black Orchid Club card made out to Williams was found at the scene of the crime. It

was irrelevant in the light of the testimony but it could not have prejudiced Williams. At the time of its introduction,-Williams- had not testified and the state had no way of knowing whether Williams would admit or deny that he was ever at the scene of the crime. It was explained in the testimony that the Black Orchid is a club in Hot Springs. Williams testified. that someone had given the card to his mother; that he had come into possession of it and had inserted his own name as member guest. His testimony was to the effect that he had exhibited the card to his young friends to impress them with his adult status and prestige. This exhibit could have only been some evidence that Williams was at the scene where the card was found, and this was admitted by Williams.

We likewise find no merit in Williams' fifth point. The two pictures of the victims were first ruled inadmissible by the trial court in light of the investigating officers' testimony as to the position of the bodies when found. The officers testified that *both* bodies had been dragged, feet first, to where they were found. Carolyn testified that Williams first dragged Parsons' body and then her mother's body from the automobile feet first. The officers testified that Williams had told them that Carolyn shot Parsons outside the automobile and that he only dragged Mrs. Cassidy's body from- the automobile as ordered by Carolyn. The pictures were only admitted after this conflict in the testimony developed and they definitely supported the testimony. of Carolyn and the officers that *both* victims had been dragged to their positions *feet first.*

The admission and relevancy of photographs must necessarily rest largely in the discretion of the trial judge. Admissibility of photographs does not depend upon whether the objects they portray could be described in words, but rather on whether it would be useful to enable the witness better to describe and the jury better to understand, the testimony concerned. Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Competent and material evidence

should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible. *Oliver* v. *State,* 225 Ark. 809, 286 S. W. 2d 17; *Smith* v. *State,* 216 Ark. 1, 223 S. W. 2d 1011 (cert. den. 339 U. S. 916); *Jones* v. *State,* 213 Ark. 863, 213 S. W. 2d 974.

Photographs are admissible for the purpose of describing and identifying the premises which were the scene of the crime, and may also be admitted to establish the corpus delicti of the crime charged, to disclose the environment and to *corroborate testimony. Stewart* v. *State,* 233 Ark. 458, 345 S. W. 2d 472 (cert. den. 368 U. S. 935).

We find no merit in Williams' sixth point. There was no evidence submitted to the jury of *previous* crimes committed by Williams. As a matter of fact Williams testified that he had never been in trouble before except that he got one ticket for failure to have a driver's license. His mother also testified that he had never been in trouble before and that he had always been a good boy. Williams also put his character in issue through a number of witnesses whose testimony was not impeached or even questioned. It developed from the oral argument on appeal that the "other crimes" referred to in the sixth assignment were the crimes of rape testified to by Carolyn, and the probable crimes of grand larceny and violation of the Dyer Act in connection with the automobile; and the probable crime of kidnapping and violation of the Mann Act in taking Carolyn across the state line of Arkansas and Texas. We find no merit in this argument. Williams was accused of first degree murder. Sexual intercourse with Carolyn against her will and without interference from her mother or Parsons was the only motive shown for the commission of the homicides. The other crimes, if they all were crimes, were incidental to crimes of murder, and Williams' flight from the scene of the crimes with which he was charged and for which he was being tried

In *Banks* v. *State,* 187 Ark. 962, 63 S. W. 2d 518, the appellant was convicted of first degree murder in the

killing of Mark Goodson. Mrs. May was with Mark Goodson and witnessed the homicide and so testified at the trial. She further testified that after the murder the appellant then raped her. It was insisted on appeal that this evidence was inadmissible because the appellant was not on trial for the crime of rape. In rejecting the contention this court said:

> "It is always entirely proper for the State to show, if it can, motive for the commission of the crime, and the evidence of Mrs. May, in reference to appellant forcing her to have sexual intercourse with him was entirely proper for this purpose. We understand the rule to be that the fact that evidence introduced to prove the motive of the crime for which the accused is on trial points him out as guilty of an independent and totally dissimilar offense is not sufficient grounds upon which to reject the testimony.

\* \* \*

> Moreover, the testimony of Mrs. May was competent for another reason, that is to say, if several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense, which is itself a detail of the whole criminal scheme." (*Dunn* v. *State*, 2 Ark. 229; *Renfroe* v. *State*, 84 Ark. 16, 104 S. W. 542).

Under the trial court's instructions on first and second degree murder, there is no question that the jury knew that Williams was being tried on the charge of murder and not on other crimes incidental thereto. There is no evidence that the jury was not an intelligent one and capable of understanding the issues under the instructions given.

We likewise find no merit in Williams' seventh point. Manslaughter is defined as the unlawful killing of a human being, without malice express or implied, and without deliberation. Ark. Stat. Ann. § 41-2207 (Repl. 1964). The appellant has correctly stated that *voluntary* manslaughter must be voluntary upon a sudden heat of passion, caused by a provocation, apparently sufficient to make the passion irresistible. Ark. Stat. Ann. § 41-2208 (Repl. 1964). But, there was no such evidence in the case at bar. The only evidence in the record of provocation at all, is Carolyn's testimony that her mother and Parsons told Williams to leave her alone. Williams denies this, but if he was provoked by such admonition, it fell far short of being legally sufficient for the creation of an irresistible passion to commit homicide in any degree. The jury was instructed on second degree murder as well as first degree, and it found Williams guilty of first degree murder.

It is well settled that in order to justify the court in giving an instruction on a lesser degree of homicide than that upon which the accused is being tried, there must be some substantial evidence to support such instruction. (*Hearn* v. *State,* 212 Ark. 360, 205 S. W. 2d 477).

In *Walker* v. *State,* 241 Ark. 300, 408 S. W. 2d 905, Walker was convicted of murder in the first degree. One of his assigned errors on appeal to this court was that the court refused to instruct the jury on manslaughter, and in that case we said:

"The court refused to grant appellant's request for an instruction on manslaughter, and this ruling is assigned as error. The same circumstances were presented to this court in *Outler* v. *State,* 154 Ark. 598, 243 S. W. 851 (1922), where it was said: 'At any rate, the verdict of the jury under this instruction (of first degree and second degree murder) necessarily implied a finding that the killing was not done under circumstances which would reduce the degree of the offense to manslaughter, and no prejudice resulted from the failure of the court to instruct

on the subject of manslaughter.' See *Newsome* v. *State*, 214 Ark. 48, 214 S. W. 2d 778 (1948), and also *Talley* v. *State*, 236 Ark. 911, 370 S. W. 2d 604 (1963), where again the refusal to instruct on manslaughter was considered harmless error in view of the fact that the appellant was found guilty of first or second degree murder.''

As to Williams' last point, he would have known, perhaps better than anyone, whether he was drunk or sober. He did not interpose the defense of drunkenness in any degree, but in fact denied the implications that he was under the influence of alcohol. If Williams was "crying drunk," as argued in his brief, when Carolyn says he fell outside the automobile, his rapid recovery in the course of about 20 minutes, as also testified by Carolyn, would defy sound reasoning based on common knowledge. According to Carolyn's version, there is no question that Williams had the presence of mind and physical ability to remove the body of Parsons as well as that of Mrs. Cassidy from the automobile; cut and remove the plastic seat cover as well as the blood stained floor mat from the rear of the automobile; remove the other articles that would tend to incriminate him if he should be apprehended in flight, even to the extent of altering the age of Parsons on his driver's license with the intent (that could be logically assumed) of assuming Parsons' identity if he found it convenient and necessary to do so. According to Williams' own testimony, he did not fall outside the automobile and was perfectly aware of everything that took place, including his ability to follow Carolyn's orders and instructions explicitly. The nearest Williams' own evidence comes to indicating that he might have been under the influence of alcohol at all, was his testimony that he had no idea how Carolyn obtained possession of his knife when he says that she gave it to him and ordered him to cut the seat covers from the automobile.

In *Newsome* v. *State*, 214 Ark. 48, 214 S. W. 2d 778, the appellant was tried for first degree murder and convicted of murder in the second degree. The court instructed the jury on first degree murder, second degree

and voluntary manslaughter. The appellant assigned as error the court's refusal to instruct on involuntary manslaughter on the theory of intoxication. In that case this court said:

"In *Weakley* v. *State,* 168 Ark. 1087, 273 S. W. 374, Mr. Justice Wood, speaking for this court, quoted Bishop on Criminal Law: 'The intention to drink may fully supply the place of malice aforethought so that, if one voluntarily becomes too drunk to know what he is about and then with a deadly weapon kills another, he does murder the same as if he were sober. In other words, the mere fact of drunkenness will not reduce to manslaughter a homicide which would otherwise be murder.' Bishop's New Criminal Law, p. 296, § 401. See, also, *Ballentine* v. *State,* 198 Ark. 1037, 132 S. W. 2d 384, and other cases cited in West's Arkansas Digest, 'Homicide,' § 28.

*    *    *

Furthermore, the verdict of guilty of murder in the second degree shows that the jury viewed the homicide as more than voluntary manslaughter. Any supposed error for failure to charge as to involuntary manslaughter was rendered harmless by the fact that the jury convicted Newsome of second degree murder. See *Farris* v. *State,* 54 Ark. 4, 14 S. W. 924; *Nash* v. *State,* 73 Ark. 399, 84 S. W. 497; *Jones* v. *State,* 102 Ark. 195, 143 S. W. 907; and *Outler* v. *State,* 154 Ark. 598, 243 S. W. 851."

We have no authority to determine whether Williams was guilty or innocent or to delve into possible reasons or motives for such heinous crimes. That was the duty of the jury who heard the evidence and observed the witnesses, including the appellant, as they testified. As much as we might wish we could do so, the trial judge and jury, as well as this court, are powerless to convert the stark reality of a senseless double homicide into merely a child's bad dream. The suffi-

ciency of the evidence to sustain the conviction is beyond question in this case, and we find no error, assigned or otherwise, that would legally require, logically permit, or morally justify us in reversing the judgment of the trial court.

The judgment is affirmed.

BYRD, J., concurs.