Frank POLLARD *v.* STATE of Arkansas

CR 75-59                           527 S.W. 2d 627

Opinion delivered September 15, 1975

*Charles S. Gibson*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Gary Isbell*, Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. Frank Pollard was convicted of first degree rape in the Desha County Circuit Court and was given the minimum sentence of 30 years in the penitentiary. On appeal to this court he assigns two alleged errors as follows:

> "I. The court erred in admitting evidence of the defendant's identification in a pretrial lineup, in violation of defendant's right to counsel guaranteed by the 6th and 14th Amendments to the United States Constitution.
>
> II. The court erred in admitting evidence obtained as a result of an unlawful search and seizure."

We shall consider the assignments of error in the order designated and shall review the evidence in more detail in connection with the second assignment. We find no merit in the appellant's first assignment.

The appellant was arrested on October 12, 1974. He was identified in a police lineup conducted four days later. The information charging the defendant with the crime for which he was convicted was filed on October 21, 1974.

In support of his argument that he was not represented by counsel at the pretrial lineup in violation of his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution, the appellant relies on the United States Supreme Court decision in *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967). The *Wade* case dealt with *post-indictment* lineup. In *Kirby* v. *Illinois*, 406 U.S. 632 (1972) the United States Supreme Court held that until the government has commenced prosecutorial proceedings against the defendant by indictment or informa-

tion, the case has not reached the "critical stage of the prosecution" where the guarantees of the Sixth Amendment are applicable. We followed the reasoning in *Kirby* in *King* v. *State*, 253 Ark. 614, 487 S.W. 2d 596 (1972), where this court said:

"Furthermore, a person's right to counsel at a lineup procedure attaches only when adversary judicial proceedings are initiated against him. *Kirby* v. *Illinois*, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411. In the case at bar the appellant was charged by an information after the assertedly unconstitutional lineup procedure; therefore, since the lineup procedure, following appellant's arrest, preceded appellant's being formally charged with any criminal offense, the proceeding was not 'a criminal prosecution' at which he had a constitutional right to be represented by counsel. *Kirby* v. *Illinois, supra.*"

In support of his first assignment the appellant also argues that the lineup was unnecessarily suggestive because the prosecuting witness observed the accused coming from the jail cell area prior to the lineup; that Tresha McGhee and Jacqueline Davis viewed the lineup at the same time, and that Jacqueline Davis was more definite as to identification at the lineup than was the victim, Tresha McGhee. We do not agree that the mere fact that the witnesses saw the appellant walking from the cell area to the lineup was suggestive because the witnesses also saw other participants coming to the lineup from the same area. In *King* v. *State,* 253 Ark. 614, 487 S.W. 2d 596 (1972), where a witness had seen the accused wearing handcuffs prior to seeing him in the lineup, we said:

"There is no evidence this incident and the momentary observation and recognition by the prosecutrix was anything other than co-incidental. Nothing was said or done by anyone to unduly direct any attention toward the appellant as being the assailant."

"A very substantial likelihood of irreparable misidentification" was the evil to which *Stoval* v. *Denno,* 388 U.S. 293 (1967), was directed and it's this likelihood which violates a

defendant's right to due process. *Neil* v. *Biggers,* 409 U.S. 188 (1972). In *Neil* the United States Supreme Court pointed out that the "totality of circumstances" is to be considered in determining whether a showup or a lineup presents a substantial likelihood of irreparable misidentification, and in *Neil* the court said:

> "We turn, then, to the central question, whether under the 'totality of circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

Both of the prosecuting witnesses in the case at bar testified that they had seen the appellant playing basketball on a court near the victim's home and recognized him by voice and appearance during the commission of the crime. By the appellant's own election at the trial a confrontation in open court was avoided for the express purpose of avoiding the possibility of in-court identification. The appellant testified that the victim Tresha McGhee and the prosecuting witness Jacqueline Davis were together when they viewed the lineup in which he participated. There was other evidence, including the testimony of the identifying witnesses, that they viewed the lineup separately. We conclude that the possibility that either Tresha McGhee or Jacqueline Davis identified the wrong man in the lineup is remote and we find no merit to this contention.

As to appellant's second assignment, we conclude that the judgment must be reversed and this case remanded for a new trial. There is no question that Tresha McGhee, a 12 year old child, was the victim of a vicious rape some time after midnight on October 12, 1974. The uncontraverted evidence is to the effect that Tresha McGhee and her 14 year old cousin Jacqueline Davis were sleeping together in Tresha's

bedroom in her mother's home on the night of October 11; that some time after midnight Tresha was awakened by a man who carried a long barrel gun and had a towel around his head or over part of his face. The bathroom light was on in the house and the intruder struck Tresha on the head with the barrel of the gun while demanding that she get out of bed and go with him.

Tresha testified that when she was first awakened by the intruder's demands, she thought it was someone playing a joke, but that her cousing Jacqueline was also awakened and advised her to do what the man said. She said she did as the man demanded and that he took her from the house through the backdoor. She said she got a "pretty close look" at him as they passed between the lighted bathroom and the kitchen, and that she had seen him previously playing basketball at a basketball court near her home. She said the man took her about a block from her home to near a church house where he raped her and threatened to kill her if she didn't stop crying. She said as an automobile passed near them, she was forced to hide behind some trees in a vacant lot; that she was then taken across the street through some briers and brush to a grassy area where she was again raped. She said her assailant warned her against telling anyone about what had happened and then let her go. She said she ran toward her home and was picked up in a car by a friend of her mother who was out searching for her. The victim was taken immediately to a hospital where the rape was medically and unquestionably confirmed.

Deputy Sheriff Roy Hogg testified that about 1:15 o'clock on October 12 he received a call pertaining to the alleged rape, and that he made the initial investigation. He said he observed a garbage can turned upside down on a folding chair outside the bathroom window where the screen had been removed, and that he dusted various items for fingerprints and then returned to the police station where he studied his notes until daylight. He said that after daylight he returned to the victim's home and retraced with her the route followed when she was taken from her home. He said the route pointed out to him led approximately three blocks from the girl's home to the rear of a church house on Cherry Street

where the victim pointed out the spot where she was raped. He said the route then continued southwest for approximately two blocks and through some blackberry briers on the rear of a lot behind a dwelling house off Cherry Street, where the prosecuting witness pointed out the spot where she was again raped. He said the two girls told him the man's name was Frank and he and the chief of police had been driving around all morning looking for the appellant. He said they took him into custody about 11:00 o'clock on October 12 when they found him standing about 150 or 200 feet across the street from the victim's home. He said the appellant was identified in the lineup by Tresha and also by Jacqueline. The record then recites as follows:

"Q. Did Tresha McGhee give you a description of what he was wearing?

A. Yes, sir.

Q. And based upon that description did you recover any clothes that he was wearing on the early morning hours of October the 12th?

A. Yes, sir, I did.

Q. When this occurred? And where did you recover them?

A. At Mr. Chapman's house where Mr. Pollard was staying.

Q. Okay, and what did you recover?

MR. GIBSON: I object, Your Honor, unless it is shown these items were recovered as a result of a lawful search. He hasn't laid the foundation for the introduction of this type of evidence.

THE COURT: The question before the Court now is, what did you recover? He hasn't offered any items. I think the question is permissible. I will overrule your objection.

MR. GIBSON: Note our exceptions.

Q. What did you recover?

A. A pair of light tan pants.

Q. Light tan pants?

A. Yes, sir.

Q. And who owned the house there?

A. Mr. Chapman.

Q. And did you determine from your investigation that's where the defendant lived?

A. Yes, sir.

Q. And did you determine from your investigation whether or not the defendant had these particular pants on the early morning hours of 1:00 o'clock?

MR. GIBSON: I am going to object to that, that calls for a conclusion.

THE COURT: Sustain the objection.

Q. And you said that's where Mr. Pollard lived?

A. Yes, sir.

Q. And you recovered a pair of tan trousers?

A. Yes, sir.

Q. Okay, now then, the second place that you described Tresha took you to describe the terrain from the church to this second point?

A. It was vacant lots and what I would call fence rows where the edge of the property would have hedge rows and brier vines.

Q. Okay, these trousers that you recovered at Chapman's house, what kind were they?

A. They were dress trousers.

MR. GIBSON: Now, Your Honor, I am going to object about any more testimony about these pants unless it is shown they were seized as a result of a lawful search, and it's already been testified to that they were recovered from where this defendant lives and I assume at the time they were recovered he was in jail.

THE COURT: I sustain the objection."

The appellant testified in his own defense. He said he was staying with his grandfather, Frank Chapman, in Dumas and had been in the area about ten months. He said he did not know Tresha McGhee or the other prosecuting witness. He said he had seen Tresha playing basketball but that he had never talked to her. He testified on direct examination that on the night in question he was at a cafe across town about six blocks from where he played basketball; that he got into an altercation with a boy named Dan Davis and another boy, and that about six boys jumped on him and interrupted his fight with Davis. He said one of the boys in the fight ran away and jumped a fence and that he later saw another one of the boys he had had trouble with at another cafe and he told him to wait until he came back. He said he then went to his cousin's house and obtained a .20 gauge shotgun with the intention of finding the boys and scaring them with the shotgun. He said he walked over town a lot looking for the boys; that he searched for his assailants until 3:00 or 4:00 o'clock in the morning of October 12. He said he was unable to find the boys so he hid his shotgun near a church house on Cherry Street and spent the rest of the night in the house of a friend named Jessie Malone. He said he got up from bed at his friend's house about 9:00 o'clock on October 12, and then he testified as follows:

"Q. All right, and then what did you do?

A. I went over to my grandfather's house and changed

clothes because the clothes I had on had blood stains in them from where the boys jumped on me the night before and bloodied my nose and I went over to my grandfather's house and changed clothes and then I went downtown and looked for Dan Davis because we was going to fight fist to fist I'll say, but I never did see him, so I went back over to my cousin's house that next morning after I left out from downtown and he was in the house so I went in and we talked and I went to use the restroom and I came back out and a boy named, they called him Jelly, I don't know, Robert Turner, we saw him there.

Q. Who?

A. Robert Turner, they call him Jelly.

Q. All right.

A. And so Robert Lee was telling Jelly that a girl had been raped last night and so I came out of the restroom and I asked him what did he say. . . . "

This hearsay was objected to and the objection sustained. The appellant then continued as follows:

"Q. All right, forget that conversation, what did you do then?

A. So I went out to the car and the next thing I know Sheriff Hogg and Chief Morgan drove up and they asked me about a shotgun, they said, 'Where that shotgun we heard you had last night.' And so I told them I didn't have a shotgun, and they took me down to City Hall and Sheriff Hogg told the Chief to lock me up and Sheriff Hogg told me that he was holding me on investigation. So they locked me up and I stayed under investigation for three days before I knew anything, then the fourth day they brought Tresha and her cousin up to identify me, and they had I guess four or five other boys off the street and they had two drunks up there, and I didn't hear the conversation what they were saying and we had numbers and they brought her back in and she took a brief look, they came in at the same time and she took a

brief look and they left back out and went back downstairs and I don't know what they told them, but anyway they carried me back down and locked me up and the next two days or so they brought warrant issued to me and said I was charged with rape."

On cross-examination of the appellant by the state's attorney the record is as follows:

"Q. What kind of trousers were you wearing on the night of October the 12th?

A. Well, they was white or beige looking.

Q. White and beige looking?

A. Right.

Q. Did they have a cuff on?

A. Yes they did.

Q. And when did you say you pulled these clothes off?

A. The next morning.

Q. The next morning?

A. The next morning.

Q. And where did you pull them off?

A. Over at my grandfather's house, Frank Chapman's.

Q. Would you look at these and see if those are . . .

MR. GIBSON: Now, Your Honor, I would want to object unless he can show how he got those clothes.

MR. TRAFFORD: I just asked him to see if he could identify them.

THE COURT: Overrule your objection.

MR. GIBSON: Sir?

THE COURT: Overrule your objection.

MR. GIBSON: Note our exceptions.

A. Yes, these are mine.

Q. Those are your trousers?

A. Right.

Q. These are the ones that you had on the night of October the 12th, is that correct?

A. That is correct.

Q. And you pulled them off at your grandfather's house the next morning?

A. I did.

Q. And they are a beige color?

A. Well, to me they are beige. To you?

MR. TRAFFORD: Your Honor, I would offer these into evidence as plaintiff's exhibit No. 1.

MR. GIBSON: I object, Your Honor, because the sheriff's testimony is that he just went in the house and got these without a search warrant. Now they have been introduced and it's proof of unlawful search and seizure.

THE COURT: Let them be introduced.

MR. GIBSON: Note my exceptions."

On cross-examination the appellant admitted that he did not tell the sheriff or other officers about the individuals

assaulting him, and that he denied to them he had a gun. On cross-examination he testified that he continued to carry the gun for about 30 minutes after he obtained it, and that he hid it in some bushes near a church on Cherry Street. He denied that he had been through any brier or thickets and his testimony on cross-examination continued as follows:

"Q. Did you run through those brushes and briers?

A. No.

Q. Did you walk through them with these trousers?

A. I wasn't in the brushes.

Q. Well, you had these trousers on though didn't you?

A. Yes.

Q. And did you run through some briers? Do these knit breeches have snags in them?

A. Yes, they had snags in them.

Q. They had snags in them?

A. Yes, sir.

Q. Well, would that indicate that you run through some briers?

MR. GIBSON: I object to that question, it calls for a conclusion.

THE COURT: Sustain the objection.

Q. Now, did you go back and get this shotgun any time during the night?

A. I did.

Q. About what time?

A. Ah, I say about one I went back and got it.

Q. You got it about one o'clock?

A. I did.

Q. Did you give it to the police officers?

A. No I didn't.

Q. Did you tell them where it was?

A. No I didn't.

Q. Did you tell them you had a shotgun?

A. No I didn't.

Q. Why didn't you?

A. Well, for the simple reason that I had heard that Tresha had been raped that night and they was looking for someone with a shotgun."

The appellant admitted that he attempted to escape from jail. He said his purpose in attempting to escape was that he wanted to prove his innocence as to the rape charge. He then testified that he had known both Tresha and Jacqueline by sight but did not know them by name. He said they also knew him by sight; that they had seen each other while playing basketball.

The arguments to the jury were transcribed and in the opening argument for the state appears the following:

"Tresha also told us that the man was wearing beige colored pants. The defendant, upon questioning on cross examination verified that he had on a pair of beige trousers that night, that he pulled these off at his grandfather's the next morning about 10:30 in the morning, and this is what he was wearing, and this is what Tresha and Jackie said he had on, beige colored trousers.

Tresha said they went through a brier patch in them, as you recall, over next to the church, south of the church. You will notice the snags in the knit trousers. What does this indicate to you? You will notice the snags all over the trousers. When you walk through briers normally, particularly with knit, you normally snag them pretty badly."

In the closing argument the state's attorney, referring to the appellant, argued as follows:

"He comes in with his beige pants. There was light to see beige pants, light to see the color of a man's pants whether coming in or going out. The little girl who was sleeping with Tresha saw her leave, she immediately went to tell, there was light coming in the bathroom and they say the man had beige pants, and that's what he said he had. 'This is the pants that I was wearing that night' is further evidence."

The state contends on appeal that the admission of the trousers into evidence over appellant's objection was not prejudicial since the facts that the trousers tended to establish were admitted on cross-examination. We do not agree. The appellant denied that he waded through brush or briers while wearing the trousers on the night of the crime and it was apparently obvious the trousers had been worn through briers or brush. No testimony was elicited as to blood stains appearing anywhere on the trousers accepted in evidence, but it must be remembered that the appellant testified he got blood on his trousers from his bleeding nose, and that was the reason he changed clothes at his grandfather's house. The trial court sustained the appellant's objection to the introduction of the trousers by the state on direct examination of the officer who obtained the trousers from the appellant's grandfather's home. The state was then permitted to do indirectly what the court correctly had ruled it could not do directly. See *Anderson v. City of El Dorado,* 243 Ark. 137, 418 S.W. 2d 801.

The state contends on appeal that if admitting the trousers was prejudicial, the judgment of the trial court

should not be reversed, but that the cause should be remanded to the trial court for an evidentiary hearing to determine whether in fact the trousers were the fruit of an illegal search and seizure. The proper time for an evidentiary hearing is before the evidence is admitted and considered by the jury. It appears from the record that the state had ample opportunity to establish the legality of this evidence when the trousers were first offered in evidence during the direct testimony of Deputy Sheriff Hogg. Officer Hogg testified that the trousers were obtained from Mr. Chapman's house where the appellant Pollard was staying and the objection which was sustained to their introduction was premised, "unless it is shown these items were recovered as a result of a lawful search," and the proper foundation laid for the introduction for this type of evidence. It would have been a simple matter to have asked Officer Hogg, preferably in chambers, just how he went about obtaining the trousers from Mr. Chapman's house.

When the appellant objected to the introduction of the trousers for the reason they were the product of an unlawful and unreasonable search and seizure, (see *Walton & Fuller* v. *State*, 245 Ark. 84, 431 S.W. 2d 462 [1968]) and the objection was properly sustained by the trial court, the state then had the burden of offering proof of the competency of the evidence before it could again be offered and accepted either on direct or cross-examination of witnesses. The state made no effort to produce a search warrant or show that Mr. Chapman or anyone at his residence, consented to the search in which the trousers were obtained. See *Dickson* v. *State*, 254 Ark. 250, 492 S.W. 2d 895 (1973). It is true that one who seeks to suppress evidence on the ground that the state violated his constitutional rights in making a search has the burden of establishing the defect in the search warrant used. *Prichard* v. *State*, **258** Ark. 151, 523 S.W. 2d 194 (1975). But in the case at bar the appellant contended there was no search warrant at all, or permission to search.

The state cites *Williams* v. *State*, 250 Ark. 859, 467 S.W. 2d 740 (1971) for the proposition that the introduction of the trousers was harmless error. The *Williams* case is not in point since in that case it was not even contended that the alleged

prejudicial evidence was seized through an illegal search, or was the product of a violation of the Federal Constitution. Where the invasion of rights guaranteed by the Federal Constitution is involved, we are obliged to follow the harmless constitutional error rule set forth in *Chapman* v. *California*, 386 U.S. 18 (1967). The *Chapman* case involved the failure of the accused to testify but in formulating the rule the United States Supreme Court referred to the case of *Fahy* v. *Connecticut*, 375 U.S. 85 (1963), a case involving unreasonable search and seizure, saying:

> "There is little, if any, difference between our statement in *Fahy* v. *Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard of all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case."

The trousers involved in the case at bar were obtained from the appellant's home. Their introduction into evidence was objected to because they were obtained through an illegal search without a warrant or consent. The objection was sustained by the trial court but, nevertheless, the trousers were admitted into evidence without an evidentiary hearing. We are unable to say the error was harmless especially in light of the emphasis placed on their condition by the state's attorney. Certainly the state failed to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *(Chapman, supra)*. We conclude, therefore, that the judgment must be reversed and this case remanded for a new trial.

The judgment is reversed and the cause remanded.